Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued February 19, 2003       Decided April 15, 2003

No. 02-5067

JIM A. TURNER,
APPELLANT

v.

DEPARTMENT OF NAVY, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 97cv01653)

*Allan B. Moore* argued the cause for appellant. With him on the briefs were *Christopher N. Sipes* and *Carlton F. W. Larson*.

*E. Roy Hawkens*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Roscoe C. Howard, Jr.*, U.S. Attorney, and *Anthony J. Steinmeyer*, Assistant Director, U.S. Department of Justice.

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Before: TATEL and GARLAND, *Circuit Judges* and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

Concurring opinion filed by *Circuit Judge* TATEL.

WILLIAMS, *Senior Circuit Judge*.   In 1994 Jim Turner, a petty officer aboard the *USS Antietam*, was found guilty of sexual misconduct in two shipboard proceedings.   The first was a "non-judicial" proceeding under Article 15 of the Uniform Code of Military Justice, 10 U.S.C. § 815, resulting in a reduction in pay grade and a forfeiture of two months salary; in the second, an Administrative Discharge Board, though rejecting some of the charges, resolved that he should be discharged from the Navy with an "other than honorable" discharge.   Discharge followed in due course.   Turner petitioned the Secretary of the Navy to clear his record and rescind his discharge.   The Secretary ultimately rejected the petition.   Turner then brought an action in district court to overturn the Secretary's decision, but the court eventually granted summary judgment for the Navy.   Turner appeals this judgment, arguing that the shipboard proceedings were not supported by substantial evidence and that several other errors require that the Secretary's decision be reversed.   We reject these arguments and affirm the district court.

* * *

Turner served in the Navy for about seven years.   In April 1994 his commanding officer, Captain Frank, learned of complaints by two of Turner's shipmates, Petty Officer John King and Seaman Apprentice Lee Poore, that Turner solicited homosexual acts and falsified records (apparently in the interest of inducing sexual cooperation).   Frank ordered Chief Petty Officer Clanahan to conduct an investigation.   At its close, three sailors (the two original accusers and Seaman Chad Maurer) signed sworn statements accusing Turner of homosexual propositioning and assault.   According to the statements, Turner asked King and Maurer to engage in sexual acts with him, improperly touched or pushed all three witnesses, signed his approval on phony performance qualifi-

cations for King, and used "indecent" language (namely, blunt descriptions of the proposed acts). Captain Frank convened a proceeding under Article 15, known as a Captain's Mast, to determine if Turner had committed these offenses and to impose non-judicial punishment if he had. Although a member of the armed forces normally has a right to demand trial by court-martial in lieu of non-judicial punishment, Turner—a member of the Navy attached to a vessel—had no such choice. 10 U.S.C. § 815(a) (2000). He was charged with four counts of soliciting another to commit a homosexual act, four counts of indecent language, two counts of indecent assault (against Poore and Maurer), one count of assault with intent to commit sodomy (against Poore), one count of making a false official statement, and one count of conduct of a nature to bring discredit upon the armed services.

At the Article 15 proceeding, Maurer, Poore, and King testified to the truthfulness of their sworn statements, which were offered into evidence. Turner presented character witnesses but did not testify. He was found guilty of all charges. Captain Frank imposed punishment consisting of demotion of one pay grade and forfeiture of $644 pay per month for two months. Turner appealed the punishment claiming lack of substantial evidence but the authorized superior officer affirmed.

Almost immediately Captain Frank referred Turner to an Administrative Discharge Board ("ADB") to determine whether he should be discharged from the Navy and whether that discharge would be an honorable one. The underlying acts being considered were the same. Maurer, Poore, and King testified against Turner, as did two other sailors corroborating their testimony. Turner testified on his own behalf, denying all charges. He also presented character witnesses and (through counsel) cross-examined the witnesses against him. The ADB rejected all of the charges relating to King and the charge of indecent assault relating to Maurer. It also rejected the charges of assault with intent to commit sodomy and indecent assault on Poore, finding that incident instead to have been a proposition for sexual acts. They found Turner guilty of the remaining charges that had been

brought under Article 15 and decided that he should be separated from the Navy with an "other than honorable" discharge.

Turner challenged the board's findings, but the Navy formally accepted its recommendation; on August 25, 1994 Turner was discharged with an "other than honorable" classification. Turner petitioned the Secretary of the Navy, who initially addresses such petitions through the Board for Correction of Naval Records ("BCNR"), to reverse the Article 15 penalties and the discharge. Over a dissent, the BCNR found error on several procedural points as well as a lack of "sufficient corroboration." It recommended that his record be cleared. A Deputy Assistant Secretary of the Navy rejected the BCNR's recommendation without comment, relying on the BCNR dissent. Cf. 32 C.F.R. § 723.7(a).

Turner then challenged the Secretary's decision in district court. Among other points, he argued that the Secretary had acted arbitrarily and capriciously in denying his arguments without explanation. The court agreed and, though retaining jurisdiction, remanded to the Secretary to assess Turner's arguments and articulate a reasoned basis for whatever decision he should make. After doing so (and adhering to the Navy's original position), the Assistant Secretary moved successfully for summary judgment in district court. Turner appeals the grant of summary judgment on several grounds.

Turner raises a number of procedural points and also argues that the outcomes of the Navy proceedings are not supported by substantial evidence. The substantial evidence issue is conventional, its particulars not justifying a published opinion. Although the parties agree that we should review for substantial evidence (a formula governing our scope of review), neither mentions the burden of proof in the Article 15 proceeding, on which in fact there appears to be division among the various services. Compare Manual of the Judge Advocate General, Department of the Navy § 0110(b) (stating that the standard is a "preponderance of the evidence"); with Air Force Instruction 51–202 § 3.4 (2002) (observing that "no specific standard of proof applies to [Article 15] proceedings

. . . ," but noting that in a court martial, which a service member is entitled to choose, the reasonable doubt standard would apply); and with Department of the Army Form 2627 ¶ 2 (1984) ("beyond a reasonable doubt"). As the Navy applied a standard of preponderance of the evidence and Turner has not objected, we apply that standard, without deciding on its propriety. On this basis we find the evidence sufficient. We now turn to the various procedural claims.

We review the district court's grant of summary judgment de novo. *Teamsters Local Union No. 61 v. United Parcel Serv., Inc.*, 272 F.3d 600, 603 (D.C. Cir. 2001). We review the decisions of the Secretary under the arbitrary and capricious standard of the APA. 5 U.S.C. § 706; *Cone v. Caldera*, 223 F.3d 789, 793 (D.C. Cir. 2000).

Of the procedural claims, the most difficult is Turner's argument that Captain Frank abused his discretion in proceeding against him under Article 15, which under the statute is "for minor offenses," 10 U.S.C. § 815(b), even though, he says, the Navy itself regarded his conduct as extremely serious. We take that issue first, and then turn to the other procedural claims in the order of their chronological appearance.

\* \* \*

*Were Turner's Offenses "Minor" for Purposes of Article 15?*

Under Article 15 (10 U.S.C. § 815) a commanding officer may impose "disciplinary punishments for minor offenses without the intervention of a court-martial." 10 U.S.C. § 815(b). Turner argues that his offenses were not minor within the meaning of this provision, and that therefore he was subject to prosecution only by court-martial. A commanding officer is to "exercise personal discretion in evaluating each case . . . as to whether nonjudicial punishment is appropriate," see Manual for Courts–Martial (the "Manual"), Part 5, V–1, at § 1(d)(2), so the claim is effectively for abuse of discretion, see *United States v. Gammons*, 51 M.J. 169, 182 (C.A.A.F. 1999) (citing the Manual), as Turner appears to acknowledge. See Appellant's Opening Brief at 38.

The government notes that § 815(f) makes clear that an Article 15 proceeding is not a bar to court-martial for "a serious crime or offense growing out of the same act or omission"; to prevent double punishment, it provides that the punishment in the Article 15 will be taken into account in the later court-martial. 10 U.S.C. § 815(f). Because § 815(f) appears to assume that Article 15 will sometimes be applied to serious crimes, the government suggests that the commanding officer's discretion to choose Article 15 is non-reviewable. But § 815(f) makes clear that the "serious crime" it refers to is one "not properly punishable under this article," *id.*, and by using the phrase "growing out of the same act or omission" the statute may merely anticipate smaller charges being pursued through Article 15 without precluding prosecution by court-martial of more serious charges arising out of the same act. Thus the text does little to advance a claim of unlimited discretion.

The structure of military punishment procedures, however, counsels extremely broad discretion for the commanding officer. The Uniform Code supplies four levels of punishment proceedings—Article 15, summary court-martial, special court-martial, and general court-martial—gradually progressing upward in both procedural protections and possible punishments. See 10 U.S.C. §§ 815, 816, 818, 819, 820. No matter how serious the offense may be, punishments imposed under Article 15 will be relatively minor. Thus the system tends to regulate itself. A major offense will normally be prosecuted by court-martial because that is the only way a serious penalty may be given. In adopting Article 15 Congress saw it as a device for protecting the service member from the stigma of a court-martial, with consequent likely loss of later civilian job opportunities, and also protecting the military from the effect of a court-martial on the member's efficiency and morale. See S. Rep. No. 1911, 87th Cong., 2d Sess., (1962), *reprinted in* 1962 U.S.C.C.A.N. 2379, 2381–82; see also *Gammons*, 51 M.J. at 178. Especially when the objection is posed for the first time after the court-martial option has effectively lapsed, close review of the commanding officer's choice of Article 15 would hardly advance these

interests; a commanding officer's choice of Article 15 might be clouded by fear of the choice being upset because the offense was too serious.

It is thus unsurprising that courts, though reviewing these choices, have given great deference to a commander's treatment of an offense as minor. *Gammons*, for example, after quoting the Senate Report mentioned above, found that the statute vested discretion in the commander in order to promote "the policy of disposing of allegations at the lowest possible level based upon individual circumstances." 51 M.J. at 182; see also *Cappella v. United States*, 624 F.2d 976, 978 (Ct. Cl. 1980) ("[T]he commanding officer has broad discretion to determine whether a particular alleged offense is sufficiently serious to warrant court-martial rather than non-judicial punishment under Article 15."); *Cochran, III v. United States*, 1 Cl. Ct. 759, 766 (Cl. Ct. 1983). So far as appears, there is only one case in which the commanding officer was found to have abused his discretion, *Hagarty v. United States*, 449 F.2d 352, 358–59 (Ct. Cl. 1971), and later cases have noted that *Hagarty* involved extreme circumstances. As the *Cappella* court said, "the captain engaged in 'angry, profane and abusive conduct toward the accused'" and violated four procedural requirements of a Captain's Mast. *Cappella*, 624 F.2d at 979 (quoting *Hagarty*, 449 F.2d at 360, and citing *Hagarty*, *id.* at 361); see also *Cochran*, 1 Cl. Ct. at 765.

Nonetheless, the maximum penalty is obviously very relevant to a commanding officer's decision whether to use Article 15. The Manual for Courts–Martial says that "[o]rdinarily" minor offenses don't include ones carrying a maximum penalty (if pursued by court-martial) of dishonorable discharge or more than a year's confinement. Manual, Part V, V–2, at § 1(e) (2000). Had Turner been prosecuted by general court-martial for indecent assault and assault with attempt to commit homosexual sodomy, his maximum sentences for each crime would have been five and ten years respectively, as well as dishonorable discharge (not the same as the "other than honorable" administrative discharge that Turner received). See *id.*, Part II, II–127, at § 1003(b)(8)(B); Part IV, IV–97, at

§§ 63(e), 64(e)(2). If this were the sole criterion, the offenses could hardly be considered minor.

But commanding officers, with court approval, consider other factors as well, and courts have affirmed use of Article 15 for offenses carrying sentences as long as Turner's. See, e.g., *United States v. Rivera*, 45 C.M.R. 582, 584 n.3 (A.C.M.R. 1972) (where a drug offense posed a maximum of ten years imprisonment if prosecuted by general court-martial). The Manual expressly mentions "the nature of the offense and the circumstances surrounding its commission; the offender's age, rank, duty assignment, record and experience; and the maximum sentence imposable for the offense if tried by general court-martial." Manual, Part 5, V–1, at § 1(e). In this case, Turner had a respectable record of seven years of military service and the exact circumstances surrounding the charges placed his conduct at the less culpable end of their technical elements.

For example, in one charge of indecent assault the witness (Maurer) said that while sharing a hotel room with Turner, he had gotten drunk, and woke up naked; he had no recollection of how his clothes were removed or any other circumstance. There was no evidence whatever that any sexual act ever happened. And the other charge of indecent assault and the charge of assault with intent to commit sodomy both arose from a single incident in which Turner had pushed Poore onto the bed with expressions of intent to commit a sexual act. Not only did no such act occur, but circumstances were such that Poore initially thought Turner was "horseplaying," and the force used was nothing to what the formal name of the charge conjures up.

Turner argues that various Navy communications and documents suggest that the Navy itself understood Turner's offenses to be very serious. The notice advising Turner of his ADB proceedings referred to his Article 15 offenses as "Serious Offense[s]"; an e-mail message from the *Antietam* to Navy authorities mentioned the "extreme sensitivity of case and seriousness of charges" and the potential for an "international incident"; and Captain Frank wrote in a report

that he "view[ed] [Turner's] conduct as sexual harassment of the most egregious nature." But none of these rather in-flamed remarks was expressed in the context of deciding whether he should be tried at an Article 15 proceeding. The meaning of a term often varies with context; one might reasonably view allegations as serious as a general matter— or, as in this case, for purposes of seeking the service member's administrative separation for "commission of a serious offense," see Naval Military Personnel Manual § 1910–142—but "minor" for purposes of Article 15.

Turner, though having some access to counsel, did not raise this argument either when told that he would be subjected to Article 15, nor on appeal from its outcome. In this case, acquiescence at the time may have little weight, as Turner had a chance only for one conversation by satellite phone with a lawyer in the brief time before the start of the Article 15 proceeding. And at the appeal stage, his counsel may have shared the idea voiced by the court in *Hagarty* that such appeals may not raise jurisdictional issues, see 449 F.2d at 356; we doubt that conclusion, as 10 U.S.C. § 815(e) allows appeals claiming the punishment is "unjust" and *Hagarty* offers no reason why a reviewing officer could not so classify punishment from a jurisdictionally defective proceeding. In any event, had Turner raised his objection at the time, the Navy would have been able to bring a court-martial proceed-ing without much difficulty. With him out of the Navy, it no longer can. See *United States ex rel. Toth v. Quarles*, 350 U.S. 11, 13–18 (1955). Whether or not Turner at the time actually preferred Article 15 (as he well might in view of its lower punishments and lesser stigma), surely others in his position would not want their commanding officer's judgment distorted by undue fear of reversal on this ground. See also *Gammons*, 51 M.J. at 182 (noting a service member's failure to assert claim of non-minor offense at his Article 15 appeal or later court-martial proceeding).

In light of the facts and the highly deferential scope of review, we reject the argument that the character of Turner's

offenses barred use of Article 15. We now turn to his narrower procedural objections.

*Credible Evidence to Begin an Investigation*

Turner argues that Captain Frank violated the Defense Department's "don't ask, don't tell" regulations by initiating an investigation of homosexual misconduct without "credible evidence" that there was a basis for discharge; he particularly invokes the requirement that there be information from a "reliable person." See DoD Dir. No. 1332.14 (Encl. 4), ¶ ¶ A.1, F. We assume the regulations' enforceability, although Enclosure 4 states that its procedures "create no substantive or procedural rights," *id.* ¶ G, and the Navy staunchly denies enforceability. Turner asserts that Petty Officer King could not be considered a "reliable person" in view of several blotches on his military record and the ADB's wholesale rejection of his testimony. But we can put King aside, as Frank also relied on Seaman Apprentice Poore, against whose reliability Turner presents a much weaker challenge.

For Poore, the worst that Turner can say is that he was a friend of King and waited seven months—until after King complained—to report Turner's conduct. But Poore made his statements under oath and had a reason for his delay. He alleged that Turner had pushed him onto a bed at a hotel room and said he was going to commit a sexual act with Poore. While Poore was frightened by the incident and left the room, he thought it was possible that Turner was joking. When Poore discovered that King had experienced sexual solicitations by Turner and improper touching, Poore naturally further discounted the more benign interpretation. While a short delay and friendship with another complainant are elements a commanding officer should take into account, they are not enough to discredit an otherwise reliable witness.

*Investigating Officer's Question of Witness's Homosexuality*

Chief Petty Officer Clanahan, who conducted the investigation at Captain Frank's request, at one point asked Seaman Maurer whether he was homosexual. Turner says that this— and the coercive conditions of the interview—violated that

portion of the "don't ask, don't tell" regulations that precludes asking members of the armed forces "their sexual orientation." See DoD Dir. No. 1332.14 (Encl. 4), ¶ D.3. Assuming the question was a violation and the regulations are enforceable, Turner's claim still fails. There is little reason to believe that the error (if such it was) affected the ADB or Article 15 proceedings.

Turner argues that Maurer was especially vulnerable to his higher-ups because he was seeking early separation, which could be granted or denied at the discretion of the *Antietam*'s command. He also notes that in the interview Maurer changed his earlier position. When first questioned about Turner, he evidently told the Executive Officer, "[T]here's nothing strange about Turner." Then Clanahan interviewed him. He turned off the main lights and turned on one single light, and took off his (Clanahan's) shirt. Maurer said later that he felt as if he were being interrogated or were a suspect. In the course of this, Clanahan asked Maurer if he was a homosexual.

However one may characterize these investigative tactics, we can find no adverse affect on Turner (assuming he may rely on a violation of Maurer's rights at all). The sole question that Turner addresses was Clanahan's asking Maurer whether he was a homosexual. Maurer answered no. In both his sworn statement, which he reaffirmed at the Article 15 proceeding and in his testimony under oath before the ADB, Maurer said that his charges were voluntary, true, and uncoerced. Interestingly, it was Maurer himself who testified that he felt a little pressured in his interview with Clanahan; yet if he had really changed his testimony in response to pressure, he would probably have wanted to hide the circumstances creating the pressure. Finally, while a long line of questioning about a person's homosexuality might influence him to cooperate, there is no evidence here of multiple questions or otherwise aggressive questioning on that topic.

*Charges Added to Charging Sheet*

Turner argues that the command violated Navy regulations by adding charges to the charging sheet during Turner's

Article 15 proceeding. Pointing to a typewritten list of charges on which some have been crossed out and others added in handwriting, and to a final comprehensive typed version, he asserts that the handwritten changes must have been added after the proceeding started. Nothing supports this claim other than Turner's assertion. The BCNR majority for some reason thought the presence of both the hand-modified and the final version suggested something fishy and thus supported the claim, but we can see neither fishiness nor support.

*Presumption of Regularity*

Turner appears to argue that even if individual problems—such as the arguably improper question to Maurer and the handwritten additions to the charging sheet—are not enough to overturn the judgment, they overcome the presumption of regularity upon which the Assistant Secretary in part relied. The Secretary's regulations state:

> The Board may deny an application in executive session if it determines that the evidence of record fails to demonstrate the existence of probable material error or injustice. The Board relies on *a presumption of regularity* to support the official actions of public officers and, in the absence of substantial evidence to the contrary, will presume that they have properly discharged their official duties.

32 C.F.R. § 723.3(e)(2) (emphasis added). Turner argues that his claims of procedural irregularity "not only eviscerate any reasonable reliance on a presumption of regularity [but] also call into question the integrity of the underlying case against Turner." Thus he sees the presumption of regularity as a protective seal that surrounds a judgment; once the seal is broken, the judgment is more vulnerable to attack.

We have serious questions about this view of the presumption. The language itself seems primarily to create a requirement that the challenging party offer sufficient evidence to show that a procedure was not followed or that an officer hadn't adequately carried out a particular duty. A sailor who

overcame the presumption on a specific issue would not thereby get a boost on matters unrelated to the error.

But in any event Turner hasn't overcome the presumption of regularity either on any specific issue or by some general chipping away at the proceeding's integrity; thus his theory cannot come into play. In fact the Assistant Secretary relied on the presumption of regularity on only two issues—use of Article 15 for a supposedly non-minor offense and the supposed manipulation of charging sheets. We have rejected both claims without reliance on the presumption.

* * *

The district court's grant of summary judgment is

*Affirmed.*

1

TATEL, *Circuit Judge*, concurring: Given our highly deferential standard of review, I concur. I write separately to point out that the Navy's refusal to correct Turner's record with respect to the very serious charges of which he was adjudged guilty at his Article 15 proceeding—but of which he was later acquitted at his discharge proceedings—undermines the very purpose of Article 15, namely, to help service members avoid the stigma of court-martial convictions while allowing military commanders to act quickly to preserve order and morale.

Although Article 15 does not define what constitutes a "minor" offense, legislative history indicates that Congress understood the distinction to follow the then-prevailing Manual for Courts–Martial, *see* S. REP. NO. 486, 81st Cong., 1st Sess. (1949), *reprinted in* 1950 U.S.C.C.S. 2222, 2235, which provided that "[a]n offense for which the Articles of War prescribe a mandatory punishment or authorize the death penalty or penitentiary confinement is not a minor offense," adding that "[o]ffenses such as larceny, fraudulently making and uttering bad checks, and the like, involve moral turpitude and are not to be treated as minor." *Hagarty v. United States*, 449 F.2d 352, 357 (Ct. Cl. 1971) (quoting MANUAL FOR COURTS MARTIAL ¶ 118 (1949)). The 1951 Manual for Courts–Martial, in effect when Congress passed the 1962 amendments expanding Article 15, essentially echoed this definition: "An offense for which . . . confinement for one year or more is authorized is not a minor offense." MANUAL FOR COURTS–MARTIAL ¶ 128(b) (1951).

The current version of the Manual for Courts–Martial removes this absolute bar to the use of Article 15 proceedings for those offenses for which one year's imprisonment is authorized. It instead provides that a "minor offense" is only "[o]rdinarily" an offense not punishable by "a dishonorable discharge or confinement for longer than 1 year if tried by general court-martial." MANUAL FOR COURTS–MARTIAL, Part V, § 1(e) (2000). That definition, on which we now rely, has been regularly interpreted as permitting commanders to use the nonjudicial punishment procedure for any number of

nominally serious offenses—that is, offenses punishable by dishonorable discharge or lengthy terms of confinement—so long as the impact of the service member's offense "upon military order and discipline [is] not so serious as to necessitate a court-martial." *Cappella v. United States*, 624 F.2d 976, 979 (Ct. Cl. 1980).

This executive expansion of Article 15 (which Turner does not challenge), however, has come with no concomitant expansion in the procedural protections afforded service members accused of nominally serious offenses. Turner's case illustrates just how important those procedural protections are. At the Article 15 proceeding, Turner was charged with (among other things) indecent assault and indecent assault with intent to commit sodomy—i.e., attempted homosexual rape—among the most serious of the military crimes recognized by Article 134 of the Uniform Code of Military Justice. These serious charges, moreover, rested on nothing more than allegations that one of his shipmates woke up naked in a hotel room he shared with Turner and that Turner threw another shipmate down on a hotel bed and expressed some intent to perform oral sex on him, an incident that the alleged victim said he initially viewed as "horseplay." After a summary proceeding at which Turner had no right to counsel, at which Captain Frank served simultaneously as prosecutor, judge, and jury, and which was governed by a preponderance-of-the-evidence standard—rather than the reasonable-doubt standard that would govern at a court-martial—Turner was adjudged guilty of both offenses. Yet at the Administrative Discharge proceeding—where, unlike the Article 15 proceeding, Turner was represented by counsel, and his accusers both testified and were cross-examined—the three-member Discharge Board unanimously acquitted him of both charges, finding that the Navy had not shown by a preponderance of the evidence that Turner had committed either indecent assault or indecent assault with intent to commit sodomy.

Despite Turner's exoneration, his military record still indicates that he was found guilty of what amounts to the

attempted rape of his shipmates, a fact that could have had serious consequences for his military career, and that may still have serious consequences in his civilian life. *See, e.g.*, 32 C.F.R. § 310.41(i) (the Department of Defense may, without the service member's consent, release military personnel records to law enforcement agencies, unless the disclosure is barred by federal statute). In view of the fact that Congress enacted Article 15 precisely to avoid creating a "permanent blot on the record of the individual punished," which would follow him "not only throughout his service career but [would] follow[ ] him into civilian life," and which "may adversely reflect on him if he is involved in difficulty with a civilian law enforcement agency," H.R. REP. NO. 87–1612, at 3 (1962), I cannot imagine why the Secretary has not corrected Turner's record to delete the Article 15 convictions for indecent assault and indecent assault with intent to commit sodomy.