# United States Court of Appeals
## For the First Circuit

No. 17-1394

JERED SASEN,

Petitioner, Appellant,

v.

RICHARD V. SPENCER,[*]
Secretary of the Navy,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Allison D. Burroughs, U.S. District Judge]

Before

Lynch and Selya, Circuit Judges,
and Levy,[**] District Judge.

Matthew T. Bohenek, with whom Sabin Willett and Eugene R.
Fidell were on brief, for appellant.
Annapurna Balakrishna, Assistant United States Attorney, with
whom William D. Weinreb, Acting United States Attorney, was on
brief, for appellee.

---

[*] Pursuant to Fed. R. App. P. 43(c)(2), we have substituted
Richard V. Spencer, Secretary of the Navy, for Sean J. Stackley,
Acting Secretary of the Navy, as appellee.

[**] Of the District of Maine, sitting by designation.

January 9, 2018

**SELYA**, **Circuit Judge**.  This case, which pits a retired petty officer against the United States Navy, is awash with novel legal questions concerning the application and operation of Article 31 of the Uniform Code of Military Justice (UCMJ).  These questions center on Article 31(b), which requires that a sailor suspected of an offense be warned both that he need not make any statement regarding that offense and that any statement he makes may be used as evidence against him in a subsequent trial by court-martial.  See 10 U.S.C. § 831(b).

Specifically, petitioner-appellant Jered Sasen asserts that he was entitled to a "cleansing warning,"[1] but failed to receive it.  He further asserts that his waiver of Article 31 rights was involuntary, that he unfairly received a negative performance evaluation, and that his promotion recommendation was improperly rescinded.  The Board for Correction of Naval Records (the Board) found these assertions unavailing and upheld the petitioner's non-judicial punishment, the Navy's rescission of his recommendation for promotion, and his adverse employment evaluation.

The petitioner sought judicial review.  The district court rejected the petitioner's asseverations and refused to set

_____

[1] The term "cleansing warning" refers to a warning given to an accused service member advising him that earlier statements, if made without an Article 31(b) warning, cannot be used against him in a subsequent trial by court-martial.

aside the Board's decision. See Sasen v. Mabus, No. 16-cv-10416, 2017 WL 1147443, at *13 (D. Mass. Mar. 27, 2017). We hold that the exclusionary remedy limned in Article 31(d) applies to evidence offered in a trial by court-martial but not in a non-judicial punishment proceeding; that both the Board's determination of voluntariness and its approval of the adverse employment consequences are in accordance with law; and that, in all events, any error is not prejudicial. Consequently, we affirm the district court's denial of the underlying petition for judicial review.

## I. BACKGROUND

We start by rehearsing the largely undisputed facts and then proceed, step by step, through the labyrinthine travel of the case.

### A. **The Facts.**

The petitioner joined the Navy in 2006 and, until early 2014, compiled an impressive record. During that period, he received positive performance evaluations and numerous awards. By 2014, he was working as a Damage Controlman aboard the USS Constitution, berthed at the Charlestown Navy Yard in Massachusetts. By then, he was "frocking" as a Chief Petty Officer.[2] At the time, he also had garnered a recommendation for a promotion to that rank (which was pending).

_____

[2] "Frocking" is the "administrative authorization to assume the title and wear the uniform of a higher pay grade" before being

- 4 -

The denouement came on January 11, 2014. While on duty that night, the petitioner learned that Elizabeth Abril, a sailor under his command, had hurt herself by punching a bulkhead out of frustration over a romantic entanglement gone sour. After Abril told the petitioner what had happened, he asked her whether she wanted to disclose the true story to their superior officer or whether she wanted to fudge the truth and say that she had slipped and fallen. Before Abril could respond, the superior happened to call, and the petitioner prevaricated about the cause of Abril's injury.

A different sailor took Abril to a shoreside medical facility, where she received care. In the morning, the petitioner reiterated the lie (that Abril had injured her hand by slipping and falling) to the incoming duty officer, Lieutenant Julien R. Geiser.

### B. The Disciplinary Review Board.

In the days that followed, the petitioner learned the hard way that "[n]othing is so painful to the human mind as a great and sudden change." Mary Shelley, Frankenstein 209 (Transatlantic

---

formally promoted to that grade. U.S. Dep't of Navy, Military Personnel Manual, 1420-060 (2014), http://www.public.navy.mil/bupers-npc/reference/milpersman/1000/1400Promotions/Documents/1420-060%20.pdf. This authorization is meant to "provide[] early recognition" for selected Navy members and obligates those members to "exercise increased authority and willingly accept greater responsibility." Id.

Press Books 2012) (1818).  This observation has special bite when damage to one's professional reputation is in prospect.

On the morning of January 13, the Navy convened an Enlisted Disciplinary Review Board (DRB) to question the petitioner about the events of January 11 and 12.  The DRB was a vehicle designed to "screen disciplinary cases of enlisted personnel and mak[e] recommendations . . . regarding dispositions."  U.S. Dep't of Navy, Navy Personnel Command Instruction 5811.1 (2007).  Among other things, a DRB may interview the accused sailor, scrutinize his service record, and hear from material witnesses.  See id.

At the commencement of a DRB hearing, accused individuals are advised of their rights under Article 31(b) of the UCMJ, which provides:

> No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

10 U.S.C. § 831(b).  The petitioner claims — and the Navy does not meaningfully dispute — that he did not receive such a warning when his DRB convened.

- 6 -

During the DRB hearing, the petitioner confessed that he had falsely told Lieutenant Geiser (on the morning of January 12) that Abril had injured her hand by slipping and falling, notwithstanding his knowledge of the true cause of her injury. A day after the DRB adjourned the hearing, it referred the petitioner to a non-judicial punishment proceeding known as a Captain's Mast. At the same time, the DRB recommended that the petitioner's promotion recommendation be rescinded.

## C.   **Post-DRB Statements.**

Within a matter of hours after the DRB hearing ended, Lieutenant Geiser informed the petitioner that, based on the events of January 11-12, the petitioner was suspected of having committed two offenses under the UCMJ: dereliction of duty (by willfully failing to report the true circumstances of Abril's injuries to the chain of command), see id. § 892, and making a false official statement (by furnishing Lieutenant Geiser, with intent to deceive, an official statement that Abril's injury was caused by "slipping on ice"), see id. § 907. Lieutenant Geiser advised the petitioner in writing of his rights under Article 31(b), but the written advice did not include a cleansing warning that informed the petitioner that his earlier unwarned statements could not be used against him in a later proceeding. The petitioner signed a waiver acknowledging that he had been advised of his Article 31(b) rights. He then made a written statement admitting that he had

falsely told his superior officer that Abril had fallen on the evening of January 11 and that he had repeated the lie the next morning to Lieutenant Geiser. The petitioner expressed regret for his actions and wrote that he had not seen "the big picture."

The petitioner was not the only person to submit a statement. On January 13, Abril wrote that, on January 11, she had told the petitioner the circumstances surrounding her injury. She described how, in her presence, the petitioner had lied to a superior officer. Although she initially planned to go along with the lie, she changed her mind: when she was asked directly by a superior officer what had happened, she told the truth.

On January 15, the petitioner was notified that the Commanding Officer was considering non-judicial punishment as recommended by the DRB. See id. § 815. The petitioner was offered the opportunity to avoid non-judicial punishment by opting instead for a court-martial. In addition, he was told that he could seek legal advice before making this choice. The petitioner, however, elected to waive his right to counsel and face non-judicial punishment (in the form of a Captain's Mast).

### D. The Captain's Mast.

The Captain's Mast was held on January 15. The presiding officer, Captain Sean D. Kearns, had received a report of the

incident from Lieutenant Geiser.[3] He also had access to the written statement that the petitioner had given to Lieutenant Geiser, Abril's written statement, and a written statement obtained from the sailor who had transported Abril to receive medical care. During the proceeding, the petitioner admitted that he had made a false report to Lieutenant Geiser on the morning of January 12.

Captain Kearns found that the petitioner had committed both of the charged offenses. For these offenses, the petitioner was subject to the following types of punishment: verbal reprimand, written reprimand, restriction, extra duties, forfeiture of pay, and reduction in rank. Captain Kearns chose to issue a written reprimand. Separate from this non-judicial punishment, Captain Kearns placed an adverse performance evaluation in the petitioner's file and rescinded the earlier recommendation for promotion.

### E. **Further Proceedings**.

The petitioner appealed the non-judicial punishment and protested both the rescission of the promotion recommendation and the adverse performance evaluation. He maintained that the punishment was not only disproportionate but also invalid because he did not receive an Article 31(b) warning prior to the DRB

---

[3] At the time of the relevant events, Captain Kearns was Lieutenant Geiser's commanding officer and, thus, was directly in the chain of command.

hearing. On February 14, 2014, the Director of Navy Staff (the Director) denied the petitioner's intra-agency appeal, declaring that his non-judicial punishment — a written reprimand — was "neither unjust nor disproportionate" to his offenses. In the course of this determination, the Director found that the petitioner had "knowingly, intelligently, and voluntarily" waived his right to counsel.

The petitioner then appealed to the Board alleging — in addition to his earlier plaints — that he had failed to receive a cleansing warning before providing further incriminating statements both to Lieutenant Geiser and at the Captain's Mast. He asked the Board to "correct" his record by removing the non-judicial punishment. See id. § 1552. The Office of the Judge Advocate General provided the Board with an advisory opinion concluding that the petitioner's non-judicial punishment was lawfully administered. Based on this opinion and other materials in the record, the Board refused the petitioner's entreaty, explaining in part that he had not made a sufficient showing to "establish the existence of [a] probable material error or injustice."

Struggling to keep his case afloat, the petitioner repaired to the federal district court. Naming the Secretary of the Navy (the Secretary) as respondent, he sought judicial review of the Board's decision under the Administrative Procedure Act

(APA). See 5 U.S.C. § 706. His petition beseeched the court to annul the non-judicial punishment and order the Board to correct his record by removing the written reprimand. He also sought to have the Board vitiate his adverse employment evaluation and reinstate the recommendation for his promotion.

Shortly after instituting the district court action, the petitioner resigned from the Navy. He remained intent, though, on removing the blot on his escutcheon, and his action continued unabated. In due season, he moved for summary judgment,[4] and the Secretary cross-moved to affirm the Board's decision. The district court took the matter under advisement and, in a thoughtful rescript, ruled in the Secretary's favor. See Sasen, 2017 WL 1147443, at *13. This timely appeal followed.

## II. STANDARD OF REVIEW

Under the APA, judicial review is limited: a district court may set aside an agency decision only if that decision is

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

---

[4] A motion for summary judgment has a "special twist in the administrative law context." Bos. Redev. Auth. v. Nat'l Park Serv., 838 F.3d 42, 47 (1st Cir. 2016) (quoting Associated Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997)). In such circumstances, the summary judgment motion merely serves to "tee up" the case for decision on the administrative record. Id.; see infra Part II (setting out APA standards of review). The traditional summary judgment framework is inapposite. See Bos. Redev. Auth., 838 F.3d at 47.

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706(2). In applying these standards, an inquiring court must "review the whole record or those parts of it cited by a party." Id. These ground rules bound the court below, and they are equally binding on this court. See River St. Donuts, LLC v. Napolitano, 558 F.3d 111, 114 (1st Cir. 2009); Royal Siam Corp. v. Chertoff, 484 F.3d 139, 144 (1st Cir. 2007). Thus, we afford no special deference to the district court's determinations but, rather, review those determinations de novo. See River St. Donuts, 558 F.3d at 114.

In the case at hand, the petitioner asseverates that the Board's decision is not "in accordance with law," gives too short shrift to a statutory right, and was reached "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), and (D). With respect to such an asseverational array, the APA requires us to be respectful of the agency's views. Thus, "a reviewing court may not substitute its judgment for that of the

- 12 -

agency, even if it disagrees with the agency's conclusions." Atieh v. Riordan, 797 F.3d 135, 138 (1st Cir. 2015) (citations and internal quotation marks omitted).

This deference, though, is not absolute. In general, the agency's answers to questions of law engender de novo review. See Ruskai v. Pistole, 775 F.3d 62, 67-68 (1st Cir. 2014). If, however, the agency's legal analysis implicates the interpretation of a statute or regulation that it is charged with administering, we give some weight to the agency's views. See Administración Para El Sustento De Menores v. Dep't of Health & Human Servs., 588 F.3d 740, 745 (1st Cir. 2009); see also Mendez-Barrera v. Holder, 602 F.3d 21, 24 (1st Cir. 2010).

A further narrowing principle is sometimes in play in administrative law cases. Congress has directed federal courts to take "due account" of the "rule of prejudicial error" when carrying out judicial review under the APA. 5 U.S.C. § 706. The party challenging the agency's determination bears the burden of showing that a particular error was prejudicial. See Shinseki v. Sanders, 556 U.S. 396, 409 (2009); Ali v. United States, 849 F.3d 510, 514-15 (1st Cir. 2017).

## III. ANALYSIS

We divide our analysis into segments that correspond to the various components of the petitioner's asseverational array. To begin, we explain why the exclusionary remedy sought by the

- 13 -

petitioner is not available in non-judicial punishment proceedings. Next, we explain why the finding of voluntariness is supportable and why, in all events, any error was harmless. Finally, we explain why the rescission of the petitioner's promotion recommendation and his negative performance evaluation are unimpugnable.

We approach the Board's decision mindful that the Board may deny relief if it concludes that "the evidence of record fails to demonstrate the existence of probable material error or injustice." 32 C.F.R. § 723.3(e)(2); see 10 U.S.C. § 1552(a). In making this assessment, the Board has the authority to consider "all pertinent evidence of record." 32 C.F.R. § 723.3(e)(1).

## A. **The Exclusionary Remedy.**

The petitioner claims that his non-judicial punishment was unlawfully administered because he was not given a cleansing warning to the effect that his earlier (unwarned) statements before the DRB could not be used against him. Due to this omission, the petitioner says, he made incriminating statements both to Lieutenant Geiser and at the Captain's Mast — statements that were ultimately used against him to support the imposition of non-judicial punishment.

We think it essential to distinguish, at the outset, between non-judicial punishment proceedings and trials by courts-martial. The UCMJ provides "four levels of punishment proceedings

- 14 -

— [non-judicial punishment], summary court-martial, special court-martial, and general court-martial — gradually progressing upward in both procedural protections and possible punishments." Turner v. Dep't of Navy, 325 F.3d 310, 314 (D.C. Cir. 2003); see 10 U.S.C. §§ 815-816, 818-820. A non-judicial punishment proceeding is an "administrative method" for "dealing with the most minor offenses." Middendorf v. Henry, 425 U.S. 25, 31-32 (1976). While it is meant to ensure order and good behavior within the armed forces, it is not a criminal proceeding. See United States v. Stoltz, 720 F.3d 1127, 1129 (9th Cir. 2013); Manual for Courts-Martial, Part V, ¶ 1.c. (2012 ed.) https://www.loc.gov/rr/frd/Military_Law/pdf/MCM-2012.pdf (the Manual for Courts-Martial). By contrast, trials by court-martial are reserved for more serious offenses and can result in relatively severe punishments. See Henry, 425 U.S. at 31-32.

The petitioner strives to convince us that he was entitled to a cleansing warning at his non-judicial punishment proceeding. This premise attempts to draw sustenance from passages in a number of official documents. See, e.g., U.S. Dep't of Navy, Commander's Quick Reference Handbook for Legal Issues 5 (2009), http://www.dtic.mil/dtic/tr/fulltext/u2/a501264.pdf; U.S. Dep't of Navy, Manual of the Judge Advocate General, A-1-v (2012), http://www.jag.navy.mil/library/instructions/JAGMAN2012.pdf (the

- 15 -

Manual of the Judge Advocate General).  The Secretary, though, disputes the petitioner's right to such a warning.

It would serve no useful purpose for us to resolve this dispute.  Ultimately, the dispositive query is whether uncleansed statements should have been excluded from the Captain's Mast proceeding under Article 31(d).  Because exclusion would not be proper even if a cleansing warning were required but not given, we simply assume, favorably to the petitioner, that he was entitled to such a warning.

From the very start, the petitioner's claim that uncleansed statements should have been excluded from the non-judicial punishment proceeding faces a formidable barrier: the text of Article 31(d) itself.  See United States v. Charles George Trucking Co., 823 F.2d 685, 688 (1st Cir. 1987) (explaining that statutory interpretation must start with an examination of the statutory text).  That text appears quite plainly to rebuff the claim that the exclusionary remedy extends to non-judicial punishment proceedings.  The statute provides: "No statement obtained from any person in violation of this article, or through the use of coercion, unlawful influence, or unlawful inducement may be received in evidence against him in a trial by court-martial."  10 U.S.C. § 831(d) (emphasis supplied).

This language strongly suggests that the exclusionary remedy set out in Article 31(d) is available only at a court-

- 16 -

martial. See Kindred v. United States, 41 Fed. Cl. 106, 112 (Fed. Cl. 1998). Such a suggestion is made more compelling by the venerable canon of statutory construction inclusio unius est exclusio alterius, which teaches that if one of a category is expressly included within the ambit of a statute, others of that category are implicitly excluded. See Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 68 (1st Cir. 2002).

That suggestion is also bolstered by the broader language of Article 31(c), the provisions of which extend to evidence introduced "before any military tribunal." 10 U.S.C. § 831(c). If Congress had intended the exclusionary remedy of Article 31(d) to apply more universally, it presumably would have used the more expansive phrasing that it used in Article 31(c). The conspicuous contrast between these adjacent provisions is a telltale sign that Congress deliberately sought to limit the applicability of Article 31(d)'s exclusionary remedy. After all, when Congress uses broad language in one section of a statute and trims down that language in a closely related section, it is reasonable to conclude that Congress intended the latter section to sweep more narrowly. See Duncan v. Walker, 533 U.S. 167, 173 (2001) ("It is well settled that where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or

exclusion." (internal quotation marks omitted)); <u>Citizens Awareness Network, Inc.</u> v. <u>United States</u>, 391 F.3d 338, 346 (1st Cir. 2004) ("The principle is clear that Congress's use of differential language in various sections of the same statute is presumed to be intentional and deserves interpretive weight.").

The petitioner demurs. He contends that Article 31(d) should, at worst, be interpreted as "silent" as to whether the exclusionary remedy applies in non-judicial punishment proceedings. He further contends that regulations and policies implemented by the Navy speak in ways that fill this "silence." But this contention is unpersuasive: the petitioner does not point to a single regulation or policy that clearly extends the exclusionary remedy to non-judicial punishment proceedings.[5]

---

[5] In an effort to prove his point, the petitioner alludes to vague statements in the JAG manual, including appendix A-1-v. But he wrests these statements from their context ignoring other relevant commentary. For example, in appendix A-1-f of the JAG manual, titled the "Nonjudicial Punishment Guide," commanding officers are asked to note that:

> If it is reasonably foreseeable that the accused's statements during the nonjudicial punishment proceedings may be considered for introduction in evidence in a later court-martial, an explanation of rights and a waiver, in the format of Appendix A-1-v of the JAGMAN, will have to be obtained from the accused, prior to or during the hearing, before proceeding further.

This language indicates that Article 31(d) rights attach only when the specter of a court-martial looms.

The closest the petitioner comes is a vague statement within the Manual for Courts-Martial, a set of rules for military adjudication promulgated pursuant to the authority provided under the UCMJ. See 10 U.S.C. § 836; Manual for Courts-Martial, Preface. The petitioner highlights a sentence within the section on non-judicial punishment proceedings stating that "[t]he Military Rules of Evidence (Part III), other than with respect to privileges, do not apply at non-judicial punishment proceedings." Attempting to build on this foundation, the petitioner suggests that extending the privilege against self-incrimination to non-judicial punishment proceedings is consistent with the quoted sentence and, thus, should dictate the mandatory exclusion of statements made without a cleansing warning. But the petitioner reads more into the quoted sentence than its text permits.

Rule 301 of the Military Rules of Evidence relates to the "[p]rivilege concerning compulsory self-incrimination." It provides, in terms, that a witness "may not assert the privilege if the witness is not subject to criminal penalty as a result of an answer by reason of immunity, running of the statute of limitations, or similar reason." Manual for Courts-Martial, Part III, Mil. R. Evid. 301(c). This condition on the exercise of the privilege casts in bold relief the privilege's core purpose: to protect an individual from making statements against his interest that would subject him to <u>criminal</u> penalties. Using a previously

made self-incriminating statement in a subsequent proceeding not designed to produce criminal penalties does not in any way interfere with this purpose. See Stoltz, 720 F.3d at 1129 (explaining that non-judicial punishment is "not criminal in nature"); see also Henry, 425 U.S. at 31-32 (1976) (contrasting "[g]eneral and special courts-martial [that] resemble judicial proceedings" with a non-judicial punishment proceeding that is "conducted personally by the accused's commanding officer" and "is an administrative method of dealing with the most minor offenses").

We add, moreover, that even if criminal penalties are in play, a statement "obtained in violation of the self-incrimination privilege or due process clause of the Fifth Amendment" is not automatically excluded from a court-martial proceeding. Manual for Courts-Martial, Part III, Mil. R. Evid. 304. Rather, the Military Rules of Evidence mandate special procedural steps — a timely motion to suppress or a timely objection — that must be taken in order to exclude the evidence. See id. If those steps are not taken, the issue is considered waived.[6] See id. The fact that such steps are a clear reference to the formal structure of a court-martial is itself an indication that the drafters of the

---

[6] We note in passing that the petitioner did not raise the Article 31(b) issue at the Captain's Mast but, rather, raised it for the first time eight days later.

- 20 -

Manual for Courts-Martial did not intend to extend the exclusionary remedy to non-judicial punishment proceedings.

Analogous case law suggests the same result. Although few courts have directly analyzed the question of whether the exclusionary rule applies to non-judicial punishment proceedings in the military setting, other courts have refused to extend Article 31(d) to bar the use of unwarned statements in civilian criminal proceedings. See United States v. Singleton, 600 F.2d 553, 555 (5th Cir. 1979); see also United States v. Newell, 578 F.2d 827, 832-33 (9th Cir. 1978). The Singleton court straightforwardly declared that "article 31(b) by its terms is limited to evidence used in a trial by court-martial." 600 F.2d at 555.

There is, of course, good reason to distinguish between the application of the privilege against self-incrimination and that of the concomitant exclusionary remedy in the context of a non-judicial punishment proceeding. At the time of an interrogation, it may not yet be clear whether a given statement will give rise to criminal liability through a court-martial. Cf. McCarthy v. Arndstein, 266 U.S. 34, 40 (1924) (explaining that privilege against self-incrimination applies whenever a statement "might tend to subject to criminal responsibility him who gives it"). Such considerations are simply not at stake in connection with the use of a previously-made incriminating statement in a

subsequent non-judicial punishment proceeding as the latter cannot — and does not — expose the accused to criminal liability.[7]

Analogies help to prove this point. For instance, in the Fourth Amendment context, the exclusion of evidence "has always been [a] last resort, not [a] first impulse." Herring v. United States, 555 U.S. 135, 140 (2009) (quoting Hudson v. Michigan, 547 U.S. 586, 591 (2006)). The reason for this chariness is evident: the exclusion of evidence levies a "costly toll upon truth-seeking." Id. at 141 (quoting Pa. Bd. of Prob. & Parole v. Scott, 524 U.S. 357, 364-65 (1998)). Even while recognizing that the deterrent value of an exclusionary rule for improperly obtained evidence is important, the Supreme Court has taken great pains to instruct lower courts that the exclusionary rule should not be applied "in every circumstance in which it might provide marginal deterrence." Id. at 141 (internal quotation mark omitted). This is especially true where there is no suggestion of intentional misconduct. See id. at 142-43. So, too, where statutory violations are concerned, exclusionary rulings are generally "disfavored as remedies for nonconstitutional violations of law."

---

[7] We take no view as to whether the analysis would be different if evidence existed of either egregious violations of Article 31(b) or rampant disregard for the provisions of that article. See, e.g., I.N.S. v. Lopez-Mendoza, 468 U.S. 1032, 1050-51 (1984) (plurality opinion). Suffice it to say that the record before us does not give rise to such questions.

United States v. Newell, 239 F.3d 917, 921 (7th Cir. 2001); see United States v. Henry, 482 F.3d 27, 32 (1st Cir. 2007).

In the case at hand, the pertinent proceeding is non-criminal, no allegation of deliberate misconduct is made, and the right asserted is statutory rather than constitutional in origin. Given this collocation of circumstances, we believe that an exclusionary remedy should be similarly disfavored.

The short of it is that the petitioner does not point to a single rule, regulation, or policy that operates to extend Article 31(d) beyond the carefully circumscribed circumstances delineated in the text of that article. When an accused sailor elects non-judicial punishment in lieu of a court-martial, he benefits from the relative informality of non-judicial punishment proceedings and the lessened severity of the potential punishments. In exchange for those benefits, he trades away certain procedural protections. The exclusionary remedy contained in Article 31(d) is one such traded protection. Cf. Van Harken v. City of Chicago, 103 F.3d 1346, 1353 (7th Cir. 1997) ("The less that is at stake . . . the less process is due.")

To say more would be to paint the lily. We hold that the petitioner's uncleansed statements were properly relied upon in the Captain's Mast proceeding.

- 23 -

## B. **The Waiver.**

In the course of finding no error in the non-judicial punishment proceeding, the Board implicitly endorsed the view of the Office of the Judge Advocate General and the Director that the petitioner's uncleansed statements were voluntary. Contesting this view, the petitioner contends that even though he signed a waiver of his Article 31 rights, his waiver was neither knowing nor voluntary because he did not receive a cleansing warning informing him that his earlier unwarned statements could not be used against him.[8] The voluntariness inquiry involves issues of law and fact, but the ultimate conclusion as to whether a confession was voluntary is a legal conclusion that is reviewed de novo. See United States v. Jacques, 744 F.3d 804, 809 (1st Cir. 2014). Warming to task, we ask whether the petitioner's uncleansed admissions were voluntary "considering all the facts and circumstances of the case." United States v. Phillips, 32 M.J. 76, 80 (C.M.A. 1991) (quoting United States v. Steward, 31 M.J. 259, 265 (C.M.A. 1990)).

The fact that the petitioner did not receive a cleansing warning does not "presumptively taint" his later statements but,

---

[8] The petitioner's briefs are tenebrous as to whether this argument is independent of, or inextricably intertwined with, his argument about the applicability of the exclusionary remedy. Because we uphold the Board's finding of voluntariness, we need not probe this point.

- 24 -

rather, constitutes one factor in the overall analysis of whether his statements were made voluntarily. Id. (citing Oregon v. Elstad, 470 U.S. 298, 309-14 (1985)). In the military setting, a myriad of factors inform the inquiry into voluntariness, including the presence or absence of explicit coercion, the presence or absence of difficult conditions (such as deprivation of food and water), the age and experience of the speaker, the time between the unwarned statements and the subsequent waiver, and the benefits that would inure to the speaker from telling the truth. See United States v. Freeman, 65 M.J. 451, 456 (C.A.A.F. 2008); United States v. Norfleet, 36 M.J. 129, 131-32 (C.M.A. 1992); United States v. Smith, No. NMCCA 20060139, 2008 WL 2252771, at *3 (N-M. Ct. Crim. App. May 27, 2008). The decisional calculus depends on the totality of the circumstances, not on any single factor. See Freeman, 65 M.J. at 456 (noting that a finding of voluntariness "rests with the particular facts of each case").

Even assuming that the burden of proving voluntariness rests with the Secretary — a matter on which we take no view — the Board had sufficient reason to find the petitioner's waiver voluntary. Cooperation plainly afforded the petitioner the likelihood of a lesser punishment and a far superior chance to preserve his reputation. By the same token, there was no clear countervailing benefit to remaining silent: the entire chain of command knew that the petitioner had lied. On this record, we

have scant difficulty in concluding that the obvious and compelling benefits of cooperation strongly support a finding that the petitioner knowingly and voluntarily decided to waive his Article 31 rights. Cf. Miller v. Fenton, 796 F.2d 598, 605 (3d Cir. 1986) ("[S]o long as [the suspect's] decision [to confess] is a product of the suspect's own balancing of competing considerations, the confession is voluntary.").

The petitioner argues that a military disciplinary proceeding is inherently coercive. This proposition — true to a limited degree — is not enough to render a confession involuntary, particularly where, as here, there is no danger of criminal liability. Even threats or misconduct aimed to compel an accused to waive his Article 31 rights require additional context in order to warrant a finding of coercion. See Freeman, 65 M.J. at 456-57 (finding no coercion where defendant was questioned for nearly ten hours, lied to by interrogating agents, and told that case would be referred to civilian authorities if he refused to cooperate). Here, the additional context favors a finding of voluntariness.

Last — but surely not least — the petitioner was not a babe in the woods. He had been in the Navy for approximately eight years and was frocking as a Chief Petty Officer. See supra note

2.  As such, he was sufficiently sophisticated to make a reasoned decision about waiver.[9]

That ends this aspect of the matter.  We uphold the Board's determination that the petitioner's waiver was made voluntarily and, thus, the Navy's use of the ensuing statements did not adversely affect his substantial rights.

### C.  The Harmless-Error Calculus.

We add, moreover, that even if error occurred — and we discern none — any such error was harmless.  We explain briefly.

In APA cases, courts are tasked to take "due account" of what is called the "rule of prejudicial error."  5 U.S.C. § 706. For all practical purposes, this provision incorporates harmless-error doctrine drawn from the ordinary run of civil cases.  See Sanders, 556 U.S. at 406.  That doctrine instructs us that an error is harmless unless it affects the complaining party's substantial rights.  See Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 102 (1st Cir. 1997).

The party challenging the agency's determination (here, the petitioner) bears the burden of showing that a particular error is prejudicial.  See Sanders, 556 U.S. at 409; Ali, 849 F.3d at

---

[9] Attempting to parry this thrust, the petitioner suggests that he did not have specific knowledge of his Article 31 rights and, therefore, could not have made a "knowing" waiver.  We do not agree.  The petitioner's tenure in the Navy surely informed him of the benefits of seeking the advice of counsel who could have edified him — but he chose to waive that right as well.

514-15. In this case, the record shows beyond hope of contradiction that the Board had substantial evidence to ground its implicit determination that the petitioner failed to carry this burden. The petitioner demurs: he asserts that the failure to exclude his inculpatory statements could not be harmless because, without those statements, there was insufficient evidence to find that he had committed the charged offenses. The record belies this assertion.

In determining whether there had been a "probable error or injustice," the Board had before it (among other things) the statement made by Abril, the recommendations of Captain Kearns, an analysis by the Director, and an advisory opinion from the Office of the Judge Advocate General. Abril's written statement alone established that:

- Abril had hurt her hand by punching a bulkhead and had told the petitioner as much;

- In Abril's presence, the petitioner had dissembled by telling a superior officer that Abril had hurt herself by falling;

- Abril had been taken to a shoreside medical facility for treatment of her injury; and

- Abril had been questioned about the incident the following evening by a superior, at which point she

provided a true account of the events that had transpired.

Similarly, the Board had access to the recommendations provided by Captain Kearns to the Director at the time of the petitioner's intra-agency appeal. There, Captain Kearns related how, despite his standing order to be informed of emergency medical situations, he was not made aware of Abril's injury until the morning following her visit to the doctor — and even then, it was the incoming duty officer, not the petitioner, who supplied the information. Indeed, the petitioner had "misrepresented the incident" to the incoming duty officer.

The Judge Advocate General's advisory opinion lent the Board further support for its decision. With no equivocation, the opinion states that "independent evidence through other witness statements demonstrate [the petitioner's] guilt." This opinion reiterated how the petitioner provided a false report to Lieutenant Geiser and how he failed to properly discharge his duty to inform his commanding officer of Abril's trip to receive medical care. It also recounts that the petitioner reported the entire incident "as a turnover item" to Lieutenant Geiser "who in turn made the proper report" to Captain Kearns.

This body of evidence against the petitioner remained largely unrebutted before the Board. Thus, even if the petitioner had not admitted lying to Lieutenant Geiser, the other proof

against him supplied an adequate basis for the Board to find that the petitioner failed to demonstrate a probable material error or injustice.

### D.  **The Adverse Employment Consequences**.

There is one more leg to our voyage.  As an ancillary matter, the petitioner invites us to direct the Board to reinstate his recommendation for promotion.  We decline the invitation.

The Navy made pellucid, at every stage of the inquiry, that the rescission of the promotion was not a sanction imposed through the non-judicial punishment proceeding, and the petitioner has not convincingly challenged this dichotomy.  In the absence of such a challenge, there is little reason to suggest that the petitioner has shown that, but for the written reprimand, the promotion recommendation would not have been rescinded on independent grounds.  After all, the recommendation was wholly within the discretion of the petitioner's commanding officers, who may reasonably have chosen to withdraw it simply because the events of January 11-12 changed their estimate of his worthiness.  On this record, the petitioner has not shown any probable error or injustice in the Board's refusal to rescind this separate and independent administrative action.

Relatedly, the petitioner entreats us to annul his adverse performance evaluation.  We deny that entreaty for

essentially the same reasons that we refuse to reinstate the recommendation for promotion.

**IV. CONCLUSION**

We need go no further. For the reasons elucidated above, the district court's denial of the petition for judicial review is

**Affirmed.**