# United States Court of Appeals
## For the First Circuit

No. 15-2270

BOSTON REDEVELOPMENT AUTHORITY,

Plaintiff, Appellant,

v.

NATIONAL PARK SERVICE and SALLY JEWELL,
as SECRETARY OF THE UNITED STATES DEPARTMENT OF THE INTERIOR,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Howard, Chief Judge,
Selya and Kayatta, Circuit Judges.

Denise A. Chicoine, with whom Edward S. Englander, Shannon F. Slaughter, and Englander, Leggett & Chicoine P.C. were on brief, for appellant.
Christine J. Wichers, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellees.

September 23, 2016

**SELYA**, **Circuit Judge**. This is a rara avis: a case that implicates the Land and Water Conservation Fund (LWCF), a fund administered under the eponymous and seldom litigated Land and Water Conservation Fund Act (LWCF Act), 54 U.S.C. §§ 200301-200310. The underlying controversy pits two government agencies against each other. The district court resolved this clash in favor of the defendants, the National Park Service (NPS) — a bureau within the United States Department of the Interior — and Sally Jewell, in her capacity as Secretary of the Interior.[1] See Bos. Redev. Auth. v. Nat'l Park Serv. (BRA I), 125 F. Supp. 3d 325, 337 (D. Mass. 2015). Concluding, as we do, that NPS acted neither arbitrarily nor capriciously in making the determination that the Boston Redevelopment Authority (BRA) challenges, we affirm.

## I. BACKGROUND

This tug-of-war involves a prime piece of real estate jutting into Boston Harbor. This piece of real estate, called Long Wharf, is currently the site of a hotel and restaurant, and it serves as a launch site for a variety of harbor tours, whale watches, and passenger boats. An open pavilion stands at the northern side of the wharf. The BRA, a public body created pursuant to state statutory law, see Mass. Gen. Laws ch. 121B,

---

[1] Since both defendants share a common interest, we refer to NPS as if it were the sole party in interest on the defendants' side of the case.

§ 4, is tasked with pursuing urban renewal and other public development activities in the City of Boston. The BRA wishes to develop the Long Wharf pavilion for commercial purposes (specifically, an additional restaurant and bar). NPS has refused to grant the BRA permission to do so, insisting that the land remain open for recreational use.

History sheds some light on this dispute. When the BRA acquired title to Long Wharf in the 1970s, the wharf was decrepit and in need of repairs. Since then, the BRA has developed Long Wharf into a thriving waterfront venue. It improved Long Wharf using, in part, an LWCF grant made available through the LWCF Act.[2] See 54 U.S.C. § 200305(a).

The LWCF Act provides "financial assistance" to states for "[p]lanning," the "[a]cquisition of land, water, or interests in land or water," and related "development" all for "outdoor recreation" purposes. Id. This financial assistance comes with strings attached: Section 6 of the LWCF Act forbids grant recipients from converting "property acquired or developed" with LWCF assistance to "other than public outdoor recreation use" without prior NPS approval. Id. § 200305(f)(3). A parcel of land acquired or developed with the aid of an LWCF grant becomes a so-

---

[2] At the time, the Heritage Conservation and Recreation Service managed the LWCF grant program. NPS later absorbed that agency and, for simplicity's sake, we refer throughout to NPS.

called Section 6(f) Area and — absent agency consent — must be preserved in perpetuity. See id.; see also 36 C.F.R. § 59.3. A funding recipient may convert the Section 6(f) Area only if it furnishes substitute "recreation properties of at least equal fair market value and of reasonably equivalent usefulness and location." 54 U.S.C. § 200305(f)(3); see 36 C.F.R. § 59.3(a).

A party seeking an LWCF grant must submit a detailed application that includes, among other things, a proposal explaining the project type, scale, and expected cost. According to the NPS manual in effect when the BRA's application was submitted, this proposal also must contain a "project boundary map" identifying the Section 6(f) Area. That map must limn the area in sufficient detail to adequately identify the property that is subject to Section 6(f) restrictions. The manual suggests that such a map might include a metes and bounds description of the protected area, a survey of that area, or a description of adjoining waterways or other natural landmarks.

We move now from the general to the specific. The LWCF Act authorizes states, but not other governmental units, to apply for LWCF funding. See 54 U.S.C. §§ 200301(2), 2003005(a). Consequently, local redevelopment agencies interested in receiving LWCF grants apply through the state in which they are located. So it was here: in March of 1980, the BRA applied to NPS, through the

- 4 -

Commonwealth of Massachusetts (the Commonwealth),[3] for an $825,000 grant to redevelop Long Wharf. NPS approved the application in the spring of 1981. Serial project agreements were thereafter executed (one between NPS and the Commonwealth and the other between the Commonwealth and the BRA). Between 1981 and 1986 (when the grant was closed), the BRA received almost $800,000 in LWCF monies.

The facts that we have set forth above are uncontroverted. Looking back, however, the parties dispute whether a particular piece of real estate on the northern side of Long Wharf (which we shall call the Pavilion area) is subject to Section 6(f) restrictions. We pause here to describe the provenance of the dispute.

In 2006, the BRA began planning to redevelop and expand the Pavilion area to accommodate a new waterfront restaurant and bar. This embryonic venture came to NPS's attention in 2009, and NPS instructed the Commonwealth to research whether the contemplated project fell within the Section 6(f) boundaries established in 1980. Relying on a 1983 map in its files, the Commonwealth determined that the Pavilion area was outside the

_____

[3] The Commonwealth's Executive Office of Energy and Environmental Affairs is the state agency responsible for administering LWCF grants in Massachusetts and served as the state intermediary in this instance. For ease in exposition, we refer throughout to the Commonwealth.

Section 6(f) boundaries. NPS acquiesced and, as a result, the Commonwealth informed the BRA that the project could continue.

In 2012, however, correspondence from retired NPS employees prompted NPS to revisit its conclusion. Upon further investigation, NPS discovered in its files a map hand-labeled "6f boundary map 3/27/80." This 1980 map, which the parties agree a NPS employee labeled, depicted a Section 6(f) Area encompassing the entire northern side of Long Wharf (including the Pavilion area). NPS staff noted that the 1980 map was consistent with other materials in the agency's files describing the Long Wharf project and determined that the 1980 map was the official project boundary map. NPS notified the Commonwealth of this determination. The Commonwealth, in turn, told the BRA that it could not convert the Pavilion area into a restaurant and bar without further NPS approval.

The matter did not end there. In April of 2014, representatives of the BRA, the Commonwealth, and NPS met to discuss NPS's determination and to give the BRA an opportunity to present its contrary view. The BRA distributed photographs, maps, and reports, and the parties toured Long Wharf on foot. NPS was unmoved: that same month, it sent a letter to the Commonwealth confirming its determination that the Pavilion area fell within the Section 6(f) Area. In June, NPS issued its final decision, accompanied by a detailed explanation of its reasoning.

Stymied by this untoward turn of events, the BRA sued NPS in the United States District Court for the District of Massachusetts. The BRA's complaint invoked the Administrative Procedure Act (APA), the LWCF Act, the Declaratory Judgment Act, and various state laws. After the parties completed a course of discovery designed to supplement the administrative record, cross-motions for summary judgment were filed. The district court granted NPS's motion and denied the BRA's motion. See BRA I, 125 F. Supp. 3d at 337. This timely appeal followed.

## II. ANALYSIS

In some respects, this case is a riddle wrapped in an enigma. It is at least arguable that the case should be viewed as a suit upon a contract, free from the constraints of administrative law. In the district court, however, both parties eschewed that approach and treated the matter as a suit for judicial review of agency action. The district court quite properly followed the parties' lead and adjudicated the case in that manner. Recognizing that parties to a lawsuit should not normally be allowed to change horses in mid-stream, we too take the same course. We think it wise, however, to note the anomaly and to make clear that we leave open (for a case in which it is properly raised and preserved) the question of whether disputes like this should be handled as straight litigation rather than as judicial reviews of agency action.

Our adoption of the approach dictated by the parties' original positions has consequences for the standard of review. Although the district court resolved the case on cross-motions for summary judgment, the summary judgment rubric has a "special twist in the administrative law context." Assoc'd Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997). In that context, a motion for summary judgment is simply a vehicle to tee up a case for judicial review and, thus, an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action was arbitrary and capricious. See Mass. Dep't of Pub. Welfare v. Sec'y of Agric., 984 F.2d 514, 526 (1st Cir. 1993); see also Sig Sauer, Inc. v. Brandon, 826 F.3d 598, 601 (1st Cir. 2016) (citing, inter alia, 5 U.S.C. § 706(2)(A)); BRA I, 125 F. Supp. 3d at 330-31 (employing this paradigm).

An agency action is arbitrary and capricious when the agency "relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise." Assoc'd Fisheries, 127 F.3d at 109. Even if an inquiring court disagrees with the agency's conclusions, it "cannot substitute its judgment for that of the agency." Id. Because we, like the district court, are bound to apply this

- 8 -

deferential standard, our review of the district court's decision is de novo. See United States v. Coal. for Buzzards Bay, 644 F.3d 26, 30 (1st Cir. 2011).

Notwithstanding this settled precedent, the BRA contends that we should review NPS's determination de novo. It asserts, belatedly, that NPS's decision was not an agency action subject to APA review but, instead, an ultra vires "attempt to encumber land." It also implies that the traditional APA standard of review does not apply to claims brought under either the LWCF Act or the Declaratory Judgment Act.

The short answer to these plaints is that they are waived. The BRA unequivocally took the position before the district court that the appropriate test was whether NPS's determination of the boundaries of the Section 6(f) Area was arbitrary and capricious.[4] Having urged one standard of review in the district court, it cannot now repudiate its earlier position and seek sanctuary in a different standard. See, e.g., Martinez-Lopez v. Holder, 704 F.3d 169, 173 (1st Cir. 2013); Ahern v. Shinseki, 629 F.3d 49, 58-59 (1st Cir. 2010).

_____

[4] After the summary judgment hearing, the BRA asked to file supplemental briefing on the applicable standard of review. The district court appropriately denied this motion as untimely. See McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 22 n.7 (1st Cir. 1991) ("Courts are entitled to expect represented parties to incorporate all relevant arguments in the papers that directly address a pending motion.").

We add, moreover, that the BRA's assertion that the APA standard does not apply to its LWCF Act claim is without force. Where, as here, a statute administered by an agency provides a cause of action but no standard of review, the APA typically fills the void. See Ruskai v. Pistole, 775 F.3d 61, 67-68 (1st Cir. 2014).

The BRA's reliance on the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, is equally misplaced. That statute simply provides an additional remedy for "disputes that come within the federal courts' jurisdiction on some other basis." Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 534 (1st Cir. 1995). Here, the BRA sought a declaration that NPS violated the APA and the LWCF Act. Given the way in which the BRA postured the case, the district court's application of the APA standard to its claim for declaratory relief cannot be faulted. See, e.g., Trafalgar Capital Assocs., Inc. v. Cuomo, 159 F.3d 21, 26 (1st Cir. 1998) (applying arbitrary and capricious standard of review to APA claims brought under the Declaratory Judgment Act).

Moreover, the BRA's argument that NPS is simply "attempt[ing] to encumber land" elevates wordplay to an art form. Given the tenor of the BRA's complaint, the district court acted within its authority in finding that NPS's determination of the boundaries of the Section 6(f) Area constituted informal agency action subject to APA review. After all, the record supports the

conclusion that NPS engaged in informal decisionmaking and issued a decision that had binding effect. No more was exigible to constitute agency action subject to APA review. See Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985); Bowler v. Hawke, 320 F.3d 59, 62-63 (1st Cir. 2003).

This brings us to the merits. We begin that portion of our inquiry by identifying those records that form the basis for our review.

In a traditional APA case, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." Camp v. Pitts, 411 U.S. 138, 142 (1973) (per curiam). Here, however, the parties — by mutual consent — conducted additional discovery to supplement the administrative record. Such additional discovery may on rare occasions be proper in an APA case where, as here, the complaining party has insinuated either that the agency acted in bad faith or that the administrative record is incomplete. See Valley Citizens for a Safe Env't v. Aldridge, 886 F.2d 458, 460 (1st Cir. 1989) (Breyer, J.). Given that both parties cite to and rely on this supplemental information throughout their appellate briefs, we see no reason to differentiate between the discovery materials and the original administrative record.[5]

---

[5] Two further points should be noted. First, the district court offered to remand the case to the agency for further review

The parties' dispute hinges on whether NPS appropriately determined that the 1980 map — and not the 1983 map — was the map of record. The BRA advocates for the 1983 map and maintains that the 1980 map was merely a concept sketch, not the official map depicting the project's Section 6(f) boundaries. NPS sees the matter differently: it dismisses the 1983 map as a Johnny-come-lately and maintains that the 1980 map depicts the Section 6(f) Area. As we explain below, the record provides ample support for NPS's view.

Our starting point is the 1980 map itself. Even though it was not formally entitled as a "Section 6(f) map," it was formally labeled "Project Area Map," indicating that it was likely provided in accordance with the NPS manual then in effect, which required applicants to submit a "Project Boundary Map" as a condition of grant eligibility. In the same vein, the 1980 map — unlike the 1983 map — was submitted in the right time frame to be the map of record. The 1983 map was not even in existence when the BRA grant application was approved — indeed, it post-dates that approval by more than two years — so it was eminently

_____

in light of the supplemental discovery, but the parties — who agree on little else — agreed that such a remand was unnecessary. Second, even if we limited our consideration to the four corners of the administrative record, the outcome would be unaffected: we would still hold, on the slimmed-down record, that NPS's decision was neither arbitrary nor capricious.

reasonable for NPS to conclude that the 1983 map was not the map of record.[6]

The 1980 map is likewise consistent with the rest of the project application. For example, a metes and bounds description contained in NPS's files corresponds generally with the 1980 map. So, too, the project proposal refers to the "Project Area Map" and uses the terms "Long Wharf" and "project site" interchangeably, indicating that the applicant and the agency both envisioned the project site as spanning most (if not all) of Long Wharf. The project agreements describe the project in equally broad terms.

There is more. Dealings in the mid-1980s suggest that the protagonists all understood that the 1980 map depicted the official Section 6(f) Area. When the Massachusetts Bay Transit Authority sought easements from the BRA to build the pavilion structure and complete underground construction to facilitate subway track access, the Commonwealth turned to NPS for confirmation that granting the easements would not serve as a conversion under Section 6(f). To facilitate NPS's decision, the Commonwealth included a copy of the 1980 map in its correspondence. The fact that the Commonwealth felt it necessary to secure NPS's consent, combined with its inclusion of the 1980 map in its

---

[6] Although the record reflects that the project agreement between the Commonwealth and NPS was amended twice after NPS approved the grant, neither amendment affected the project area boundary in any way.

correspondence, serves to fortify NPS's determination that the 1980 map was the map of record with respect to the Section 6(f) boundaries.

Nor does the BRA gain ground by its assertion that the Commonwealth, which it says maintained the official grant file, had the 1983 map, but not the 1980 map, in its file. The project agreement says only that the parties agree to perform the agreement in accordance with the "maps . . . attached hereto or retained by the State and hereby made a part hereof." The record offers no reason to believe that the 1980 map, which the BRA admits was part of its grant application, was not made a part of the project agreement in this manner.

To say more on this point would be to paint the lily. The 1980 map's depiction of the Section 6(f) Area corresponds with the BRA's project proposal and with the project agreements executed when NPS approved the BRA's grant request. We conclude, therefore, that NPS's determination that the 1980 map was the map of record vis-á-vis the Section 6(f) Area was entirely plausible. It follows that the agency's decision was supported by substantial evidence and was neither arbitrary nor capricious. We so hold.[7]

_____

[7] The case at hand presents a relatively narrow question, and our holding is correspondingly narrow. We decide only that the Pavilion area is within the Section 6(f) Area. It is not necessary for us to decide any other questions, and we do not do so.

- 14 -

Two other arguments advanced by the BRA warrant only brief discussion. First, the BRA alleges that the LWCF grant that it received was used only for planning purposes. Building on this foundation, it asseverates that NPS misconstrued the LWCF Act inasmuch as the Section 6(f) requirement attaches only to land "acquired or developed" with LWCF grants and not to project "planning" undertaken with those grants. Second, the BRA asseverates that NPS transgressed its due process rights by failing to afford it a sufficient opportunity to show that the 1983 map was the map of record (thus violating procedural due process) and by effecting an uncompensated taking of the BRA's property (thus violating substantive due process).

Neither of these asseverations need detain us. The BRA did not advance or develop either asseveration in the court below. We have held, "with echolalic regularity," that arguments not timely raised in the district court cannot be raised for the first time on appeal. Iverson v. City of Boston, 452 F.3d 94, 102 (1st Cir. 2006); see Teamsters, Chauffeurs, Warehousemen & Helpers Union v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992) ("If any principle is settled in this circuit, it is that, absent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time

on appeal.").[8]  This raise-or-waive rule is "founded upon important considerations of fairness, judicial economy, and practical wisdom," Nat'l Ass'n of Soc. Workers v. Harwood, 69 F.3d 622, 627 (1st Cir. 1995), and there is no sound reason why we should not adhere to it in the circumstances of this case.

If more were needed — and we do not think that it is — these asseverations are plainly devoid of merit.  To begin, the distinction between acquisition and development, on the one hand, and planning, on the other hand, is artificial.  Section 6(f)(3) is the "cornerstone of Federal compliance efforts to ensure that the Federal investments in [LWCF] assistance are being maintained in public outdoor recreation use."  36 C.F.R. § 59.3(a).  The BRA's interpretation of the LWCF Act would permit grant recipients to chip away at this cornerstone.  For example, grant recipients could skirt Section 6(f) entirely by allocating their LWCF stipends wholly for "planning" rather than for acquisition or development.  We refuse to read such a gaping loophole into the statute.  Furthermore, to the extent (if at all) that the LWCF Act is ambiguous on this point, we find NPS's reading of the statute

_____

[8] Here, moreover, the BRA has doubled down on its waiver by failing to raise either of these arguments before the agency.  See Padgett v. Surface Transp. Bd., 804 F.3d 103, 109 (1st Cir. 2015) (explaining that failure to raise an argument before the agency waives any judicial review of that argument).

- 16 -

reasonable and defer to that reading. See Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842-45 (1984).

The BRA's procedural due process argument is equally flawed. The APA sets forth no strict procedural regime for informal agency decisionmaking, and a party's procedural due process rights are respected as long as the party is afforded adequate notice and an opportunity to be heard "at a meaningful time and in a meaningful manner." Mathews v. Eldridge, 424 U.S. 319, 333 (1976) (internal quotation marks omitted). Here, the BRA received both adequate notice and a meaningful opportunity to be heard. It was informed, well before the April 2014 meeting, that NPS believed that the pavilion was within the Section 6(f) boundary. At that meeting, it presented arguments and supporting materials to buttress its position. The core requirements of procedural due process were indisputably satisfied.

The BRA's substantive due process argument fares no better. Far from being an unauthorized taking, NPS's determination that the Pavilion area could not be developed for commercial purposes was entirely consistent with both the terms of the LWCF Act and the project agreements. To cinch the matter, the Section 6(f) restrictions were part of the bargain that the BRA struck with NPS in order to secure the financial assistance that it sought to rehabilitate Long Wharf. When a party applies for and receives a federal grant, there is nothing either unfair or unconstitutional

about holding the grant recipient to the terms of its bargain. See Kuperman v. Wrenn, 645 F.3d 69, 79 (1st Cir. 2011) (citing South Dakota v. Dole, 483 U.S. 203, 206 (1987)).

**III.  CONCLUSION**

Although we need go no further, we think an additional comment is in order.  The BRA complains that, by upholding NPS's decision, we will be allowing the agency to "restrict the entirety of an invaluable piece of [the Boston] waterfront in perpetuity." This complaint is groundless.  As we already have explained, the limitation of the Pavilion area to public outdoor recreational use is exactly what the BRA offered when it applied for, and received, over three-quarters of a million dollars in federal financial assistance.[9]

For now, at least, the long war over Long Wharf is at an end.  Based on the reasoning elaborated above, the judgment of the district court is

**Affirmed.**

---

[9] In all events, the BRA remains free to develop the Pavilion area as long as it does so within the parameters permitted by the LWCF Act (that is, for public outdoor recreation uses).  If the BRA chooses to exceed those parameters, it may do so, as long as it substitutes other property that NPS deems acceptable for public outdoor recreational uses.  See 54 U.S.C. § 200305(f)(3).