# United States Court of Appeals
## For the First Circuit

No. 23-1197

DAVID LITTLEFIELD; MICHELLE LITTLEFIELD; TRACY ACORD; DEBORAH
CANARY; FRANCIS CANARY, JR.; VERONICA CASEY; PATRICIA COLBERT;
VIVIAN COURCY; WILL COURCY; DONNA DEFARIA; ANTONIO DEFARIA;
KIM DORSEY; KELLY DORSEY; FRANCIS LAGACE; JILL LAGACE; DAVID
LEWRY; KATHLEEN LEWRY; MICHELE LEWRY; RICHARD LEWRY; ROBERT
LINCOLN; CHRISTINA ALMEIDA; CAROL MURPHY; DOROTHY PEIRCE;
DAVID PURDY,

Plaintiffs, Appellants,

v.

U.S. DEPARTMENT OF THE INTERIOR; DEBRA HAALAND, in her official
capacity as Secretary of the Interior; BUREAU OF INDIAN AFFAIRS;
BRYAN NEWLAND, in his official capacity as Assistant Secretary
for Indian Affairs; MASHPEE WAMPANOAG INDIAN TRIBE,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Angel Kelley, U.S. District Judge]

Before

Montecalvo, Lynch, and Rikelman,
Circuit Judges.

David H. Tennant, with whom Kathy L. Eldredge, Law Office of
David Tennant PLLC, David J. Apfel, and Goodwin Procter LLP were
on brief, for appellants.
Christopher Anderson, Attorney, Department of Justice,
Environment and Natural Resources Division, with whom Todd Kim,
Assistant Attorney General, and Mary Gabrielle Sprague, Attorney,

were on brief, for federal appellees.

Tami Lyn Azorsky, with whom V. Heather Sibbison, Suzanne R. Schaeffer, Samuel F. Daughety, Catelin Aiwohi, and Dentons US LLP were on brief, for appellee Mashpee Wampanoag Indian Tribe.

---

October 31, 2023

---

LYNCH, **Circuit Judge**.  Appellants David and Michelle Littlefield and twenty-two others assert the district court erred in rejecting their challenge to a decision by the Department of the Interior's Bureau of Indian Affairs ("BIA"), made in 2015 and reaffirmed in 2021, to take two parcels of land in Massachusetts into trust for the Mashpee Wampanoag Indian Tribe ("the Tribe"). The Secretary of the Interior has the power to take land into trust pursuant to the Indian Reorganization Act ("IRA") "for the purpose of providing land for Indians."  25 U.S.C. § 5108.  Appellants have abandoned any Chevron challenge to the Secretary's legal interpretation of section 19 of that statute, 25 U.S.C. § 5129, defining the term "Indians."  Accordingly, we determine only whether the BIA's application of its legal interpretation to the facts was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A).  We uphold the BIA's determination and affirm on somewhat different reasoning than the district court.

## I.

### A.        Prior relevant legal proceedings

The Secretary of the Interior may, under the IRA, "acquire land and hold it in trust 'for the purpose of providing land for Indians.'"  Carcieri v. Salazar, 555 U.S. 379, 381-82

(2009) (quoting 25 U.S.C. § 5108, then codified at 25 U.S.C. § 465). Section 19 of the statute defines the term "Indian" as:

> [1] all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction, and [2] all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and shall further include [3] all other persons of one-half or more Indian blood.

25 U.S.C. § 5129 (numbers in brackets added).

In Carcieri, the Supreme Court, interpreting the word "now" in the first definitional phrase in this section, held that it "unambiguously refers to those tribes that were under the federal jurisdiction of the United States when the IRA was enacted in 1934." Carcieri, 555 U.S. at 395. As such, the Secretary must first have determined, before acquiring land for a tribe pursuant to the first definition of "Indian," that the tribe was under federal jurisdiction in 1934. Id. The Carcieri decision did not address the meaning of the phrase "under Federal jurisdiction."

In Littlefield v. Mashpee Wampanoag Indian Tribe, a decision of this Court concerning the Mashpee Tribe, we held that the clause "under Federal jurisdiction" contained in the first definition of "Indian" also applies to the second definition. 951 F.3d 30, 40-41 (1st Cir. 2020). The term "such members" in that definition refers to the entire antecedent clause "members of any recognized Indian tribe now under Federal jurisdiction." See id.

- 4 -

In 2014, the Solicitor of the Department of the Interior issued a legal interpretation of the phrase "under Federal jurisdiction" in a memorandum ("the M-Opinion").[1] U.S. Dep't of Interior, M-37029, The Meaning of "Under Federal Jurisdiction" for Purposes of the Indian Reorganization Act (Mar. 12, 2014). The M-Opinion also addressed whether a tribe must have been "recognized" as of 1934. M-Opinion at 23-24; see 25 U.S.C. § 5129 (defining as "Indian," among others, "all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction" (emphasis added)). The M-Opinion, agreeing with Justice Breyer's concurrence in Carcieri, found that "the IRA does not require that the agency determine whether a tribe was a 'recognized Indian tribe' in 1934; a tribe need only be 'recognized' at the time the statute is applied." M-Opinion at 25.

The D.C. Circuit and the Ninth Circuit have upheld against Chevron challenges the M-Opinion's interpretation of the phrase "under Federal jurisdiction," as well as its conclusion that recognition need only be shown as of the time that the Secretary invokes the statute. Confederated Tribes of Grand Ronde

---

[1] The M-Opinion is binding on the Department and its officials unless withdrawn. Mashpee Wampanoag Tribe v. Bernhardt, 466 F. Supp. 3d 199, 208 (D.D.C. 2020). Interior withdrew the M-Opinion in March 2020, id. at 217, but reinstated it in April 2021. The agency applied the M-Opinion's standards in the decision that is at issue in this case.

Cmty. of Or. v. Jewell, 830 F.3d 552, 561, 564-65 (D.C. Cir. 2016); County of Amador v. U.S. Dep't of the Interior, 872 F.3d 1012, 1024, 1027 (9th Cir. 2017).

**B.        Prior relevant determinations**

In 2007, the BIA granted formal recognition to the Tribe.[2]  Final Determination for Federal Acknowledgment of the Mashpee Wampanoag Indian Tribal Council Inc. of Massachusetts, 72 Fed. Reg. 8007-01 (Feb. 22, 2007).  Shortly after the recognition decision, the Tribe requested that Interior take into trust for its use two parcels of land in Massachusetts, one in Mashpee and the other in Taunton.

In 2015, Interior issued a Record of Decision ("2015 ROD") approving the Tribe's request.  The BIA found that the Tribe was eligible to have land taken into trust because it qualified under the second definition of "Indian" in the IRA.  See 25 U.S.C. § 5129 ("The term 'Indian' as used in this Act shall include . . . [2] all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian

---

[2]     The BIA's 2015 Record of Decision provides a summary of the Tribe's history, in a section that is incorporated in the 2021 Record of Decision that is at issue in this case. Bureau of Indian Affairs, Record of Decision: Trust Acquisition and Reservation Proclamation for 151 Acres in the City of Taunton, Massachusetts, and 170 Acres in the Town of Mashpee, Massachusetts, for the Mashpee Wampanoag Tribe, at 101-17 (Sept. 18, 2015), https://www.bia.gov/sites/bia.gov/files/assets/public/oig/pdf/idc1-031724.pdf.

reservation. . . ."). The agency did not consider whether the Tribe met the requirement of being "under Federal jurisdiction" in 1934.

In February 2016, a group of Taunton residents (the appellants in this case plus another individual), who opposed the Tribe's plan to develop the land commercially, filed suit against Interior in the U.S. District Court for the District of Massachusetts, challenging the 2015 ROD. Littlefield v. U.S. Dep't of Interior, 199 F. Supp. 3d 391, 393 (D. Mass. 2016), aff'd sub nom. Littlefield v. Mashpee Wampanoag Indian Tribe, 951 F.3d 30 (1st Cir. 2020). The district court agreed with the plaintiffs that the second definition of "Indian" in the IRA unambiguously incorporates the "now under Federal jurisdiction" requirement from the first definition. Littlefield, 951 F.3d at 34. Because BIA had found the Tribe to be eligible under the second definition without considering whether it was under federal jurisdiction in 1934, the court vacated the agency's decision. Id. In a subsequent order, the court clarified that Interior was permitted to consider, on remand, whether the Tribe met the "now under Federal jurisdiction" requirement. Id. In February 2020, this Court affirmed the district court's ruling. Id. at 41.

Meanwhile, in 2018, Interior issued a new Record of Decision ("2018 ROD") finding that the Tribe was not "under Federal jurisdiction" in 1934, and so did not qualify to have lands taken

- 7 -

into trust. Id. at 34. The Tribe then sued Interior in the U.S. District Court for the District of Columbia ("D.D.C."), arguing that the agency had misapplied the standards in the M-Opinion. Mashpee Wampanoag Tribe v. Bernhardt, 466 F. Supp. 3d 199, 217 (D.D.C. 2020). The court agreed. Id. at 217-18. In a decision issued in June 2020, it found that the "Secretary [had] misapplied the M-Opinion by evaluating each piece of evidence in isolation," id., whereas the M-Opinion had stated that "a variety of actions when viewed in concert may demonstrate that a tribe was under federal jurisdiction," id. (quoting M-Opinion at 19). The court also found that the Secretary's treatment of several pieces of evidence was inconsistent with the M-Opinion's standards, e.g., id. at 220, and with the agency's treatment of similar types of evidence in prior decisions, and that the agency had not offered a reasoned explanation for those inconsistencies, e.g., id. at 227. As such, the court vacated the 2018 ROD and remanded to Interior "for a thorough reconsideration and re-evaluation of the evidence . . . consistent with this Opinion, the 2014 M-Opinion, . . . and the Department's prior decisions."[3] Id. at 236.

Interior revisited the issue in response to the vacate and remand order and, in 2021, issued a new Record of Decision.

[3] Interior filed a notice of appeal but later moved to dismiss the appeal. See Mashpee Wampanoag Tribe v. Bernhardt, No. 20-5237, 2021 WL 1049822, at *1 (D.C. Cir. Feb. 19, 2021).

Bureau of Indian Affairs, Mashpee Wampanoag Tribe, Trust Acquisition Decision Letter (Dec. 22, 2021) [hereinafter "2021 ROD"].  The agency reevaluated the evidence in light of the M-Opinion's standards and the D.D.C.'s instructions on remand, concluding that the Tribe met the "under Federal jurisdiction" requirement.  2021 ROD at 25.  Interior also found that the Tribe could conduct gaming activities on the land taken into trust because the land qualified as the Tribe's "initial reservation" under the Indian Gaming Regulatory Act ("IGRA").  25 U.S.C. § 2719(b)(1)(B)(ii); 2021 ROD at 31-54.

## C.      Procedural history of the litigation that gives rise to this appeal

The appellants in this action then filed suit in the U.S. District Court for the District of Massachusetts, challenging the 2021 ROD as "arbitrary, capricious, . . . or otherwise not in accordance with law" under the APA.  5 U.S.C. § 706(2)(A).  They argued that the Tribe did not, as of 1934, qualify as a "tribe" within the meaning of the IRA, and that it was not "under Federal jurisdiction."  They also claimed that the parcel of land located in Taunton was not eligible for gaming activities under the IGRA.[4]

After considering the parties' motions, the district court granted summary judgment in favor of Interior and the Tribe, finding that the 2021 ROD was not arbitrary or capricious.

---

[4]      The appellants have abandoned this challenge.

Littlefield v. U.S. Dep't of the Interior, No. 22-CV-10273, 2023 WL 1878470, at *15 (D. Mass. Feb. 10, 2023). The plaintiffs appealed.

## II.

We review de novo the district court's decision on the parties' cross-motions for summary judgment. Bos. Redevelopment Auth. v. Nat'l Park Serv., 838 F.3d 42, 47 (1st Cir. 2016). Under the APA, we "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Because the APA standard affords great deference to agency decisionmaking and because the Secretary's action is presumed valid, judicial review, even at the summary judgment stage, is narrow." Visiting Nurse Ass'n Gregoria Auffant, Inc. v. Thompson, 447 F.3d 68, 72 (1st Cir. 2006) (quoting Associated Fisheries of Maine, Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997)).

We find agency action to be "arbitrary and capricious when the agency 'relie[s] on improper factors, fail[s] to consider pertinent aspects of the problem, offer[s] a rationale contradicting the evidence before it, or reache[s] a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise.'" Bos. Redevelopment Auth., 838 F.3d at 47 (quoting Daley, 127 F.3d at 109). Although

- 10 -

the standard of review is highly deferential, we must conduct a searching examination to ensure that the agency's decision is reasonably supported by the administrative record. See, e.g., id. at 48-49. Still, we "uphold an agency determination if it is 'supported by any rational view of the record.'" Marasco & Nesselbush, LLP v. Collins, 6 F.4th 150, 172 (1st Cir. 2021) (quoting Atieh v. Riordan, 797 F.3d 135, 138 (1st Cir. 2015)).

## III.

The appellants' principal argument on appeal is that the 2021 ROD is "not in accordance with law," 5 U.S.C. § 706(2)(A), because the Supreme Court's decision in Carcieri precludes a finding that the Mashpee Tribe was "under Federal jurisdiction" in 1934. The appellants also argue that the Secretary's failure to consider this argument makes the 2021 ROD arbitrary or capricious under the APA.

The Carcieri case did not involve the Mashpee Tribe, but, rather, the Narragansett Tribe, which is another tribe that has historically resided in southern New England. See Carcieri, 555 U.S. at 383. The Court held in Carcieri that the Narragansett Tribe was not under federal jurisdiction in 1934. Id. at 395-96. The appellants argue that the "Narragansetts' historical record is indistinguishable from the Mashpees['] from the 17th century on," and so the Secretary cannot conclude that the Mashpee Tribe was

"under Federal jurisdiction" in 1934 "except by conflicting with Carcieri."

This argument rests on many faulty premises, starting with the appellants' misreading of Carcieri. The Court there held:

> None of the parties or amici, including the Narragansett Tribe itself, has argued that the Tribe was under federal jurisdiction in 1934. . . . Moreover, the petition for writ of certiorari filed in this case specifically represented that "[i]n 1934, the Narragansett Indian Tribe . . . was neither federally recognized nor under the jurisdiction of the federal government." Respondents' brief in opposition declined to contest this assertion. Under our rules, that alone is reason to accept this as fact for purposes of our decision in this case. We therefore reverse the judgment of the Court of Appeals.

Carcieri, 555 U.S. at 395-96 (internal citations omitted and alterations and second omission in original). The Court "accept[ed] . . . as fact" that the Narragansett Tribe was not under federal jurisdiction in 1934 because Interior had failed to contest petitioners' assertion to that effect. Id. Although the Court did suggest that the extremely limited evidence in the record before it was not indicative of federal jurisdiction in 1934, see id. at 395, its conclusion rested on the parties' concessions rather than on an analysis of the Narragansett Tribe's history, id. at 395-96. Indeed, given the Secretary's pre-Carcieri interpretation of the statute, which did not consider a tribe's jurisdictional status in 1934, "it is not surprising that neither

- 12 -

he nor the Tribe raised a claim that the Tribe was under federal jurisdiction in 1934: they simply failed to address an issue that no party understood to be present." Carcieri, 555 U.S. at 401 (Souter, J., concurring).

The Carcieri holding with respect to the Narragansett Tribe does not compel the Department as a matter of law, then, to find that the Mashpee Tribe was also not "under Federal jurisdiction" in 1934. The appellants point to some surface similarities between the Mashpees and the Narragansetts, such as the fact that they both had contact with 17th-century colonists and were both subject to "assimilation/citizenship/detribalization laws that ma[de] the[ir] tribal members citizens of the[ir] respective] state[s]." But those alleged similarities do not require Interior to conclude that the Narragansetts' history is indistinguishable from the Mashpees' in all relevant respects, and much less that the two tribes' administrative records are identical. As explained, Interior had no reason to compile evidence that the Narragansetts were under federal jurisdiction in 1934 because its pre-Carcieri interpretation of the statute obviated that requirement. See M-Opinion at 3 n.15 ("The issue of whether the Narragansett Tribe was 'under federal jurisdiction in 1934' was not considered by the BIA in its decision [that led to Carcieri], nor was evidence concerning that issue included in the administrative record before the courts.").

- 13 -

For the same reasons, we reject the argument that the Secretary failed, arbitrarily, to compare the Mashpee Tribe's history to the Narragansett's.[5]

**IV.**

The appellants also argue that the 2021 ROD is "not in accordance with law" under the APA because, at the time the IRA was enacted, the Mashpee Tribe was not a "tribe" within the meaning of the first definition of "Indian" in the IRA. That definition comprises "all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction." 25 U.S.C. § 5129. The appellants claim that, because a "tribe" must have been "under Federal jurisdiction" in 1934, it must, as a matter of logic, have been in existence at that time.[6] We do not express a view on this question of statutory interpretation because appellants have not shown, as a matter of law, that the Mashpee Tribe did not qualify as a "tribe" in 1934.

---

[5] Because we dispose of the appellants' argument on the merits, we do not consider whether the D.D.C.'s rejection of the same argument in prior litigation between the parties, see Bernhardt, 466 F. Supp. 3d at 215 n.9, would preclude the appellants from raising it again here.

[6] The appellants do not contend that the Tribe must have been "recognized" as of 1934. To the extent that they advance this argument in their reply brief, it is waived. United States v. Vanvliet, 542 F.3d 259, 265 n.3 (1st Cir. 2008) ("Arguments raised for the first time in a reply brief are waived.").

- 14 -

The federal government formally acknowledged the Mashpee Tribe as an Indian tribe in 2007. Final Determination for Federal Acknowledgement of the Mashpee Wampanoag Indian Tribal Council, Inc. of Massachusetts, 72 Fed. Reg. 8007-01 (Feb. 22, 2007). As part of that process, Interior evaluated the Tribe's historical record and determined, among other things, that the Tribe has been "identified . . . as an American Indian entity on a substantially continuous basis since 1900," id. at 8007 (citing 25 C.F.R. § 83.7(a) (2007)), that "a predominant portion" of the Tribe "comprise[d] a distinct community and has existed as a community from historical times until the present," id. (citing 25 C.F.R. § 83.7(b) (2007)), and that the Tribe "has maintained political influence or authority over its members as an autonomous entity from historical times until the present," id. at 8008 (citing 25 C.F.R. § 83.7(c) (2007)). Given those findings, a determination that the Mashpee existed as a tribe in 1934 is supported by a rational view of the record. See Collins, 6 F.4th at 172 ("[C]ourts should uphold an agency determination if it is 'supported by any rational view of the record.'" (quoting Riordan, 797 F.3d at 138)).

The appellants argue that the Secretary was in error because the modern criteria for federal acknowledgment of a tribe are irrelevant, as they postdate passage of the IRA, and the term "tribe" in the statute unambiguously refers to the definition

- 15 -

proposed by the Supreme Court in Montoya v. United States, 180 U.S. 261 (1901). Interpreting a statute not at issue here, the Court noted in that case that "[b]y a 'tribe' we understand a body of Indians of the same or a similar race, united in a community under one leadership or government, and inhabiting a particular though sometimes ill-defined territory." Id. at 266. The Court referenced that definition in a later case, finding that a statute limiting alienation of land "from any Indian nation or tribe of Indians" was "more reasonabl[y] view[ed] . . . in the sense" given in Montoya, such that Pueblo Indians were "easily include[d]." United States v. Candelaria, 271 U.S. 432, 441-42 (1926).

The appellants argue that "Congress in 1934 is presumed to have incorporated that common law definition into the IRA." They claim, then, that the Secretary's failure to test the Mashpee's status as a "tribe" under the Montoya definition was arbitrary or capricious. We disagree, because the IRA did not unambiguously incorporate that definition and so the Secretary was not required to consider it.

This Court has noted that "when Congress uses a common law term and does not otherwise define it, it is presumed that Congress intended to adopt the common law definition." United States v. Gray, 780 F.3d 458, 466 (1st Cir. 2015) (quoting United States v. Patterson, 882 F.2d 595, 603 (1st Cir. 1989)). But, contrary to the appellants' assertion, the term "tribe" is neither

a "common law term" of art nor is it "otherwise [un]define[d]" in the statute.  See id. at 466.

In the IRA, Congress defined both "Indian" and "tribe" in particular ways, without mentioning the Montoya definition. See 25 U.S.C. § 5129.  And, although the Montoya Court had provided a definition of "tribe" in the context of interpreting a different statute, the term "tribe" is not a "term[] of art in which [is] accumulated the legal tradition and meaning of centuries of practice," such that Congress, in "borrow[ing]" the term, should be presumed to "know[] and adopt[] the cluster of ideas that were attached . . . and the meaning its use will convey to the judicial mind."  See Morissette v. United States, 342 U.S. 246, 263 (1952); Carter v. United States, 530 U.S. 255, 264 (2000) ("Th[e] limited scope of the canon on imputing common-law meaning has long been understood.").  The cases that appellants cite to are inapposite: the term "tribe" is not, like the term "prosecution," a "familiar legal expression[]" used in a "familiar legal sense," Bradley v. United States, 410 U.S. 605, 609 (1973) (quoting Henry v. United States, 251 U.S. 393, 395 (1920)), nor is it a term, like "bequest," with a "judicially settled meaning," United States v. Merriam, 263 U.S. 179, 187 (1923).  The Montoya definition applied to the statute at issue in that case, but it was not incorporated as a matter of law into the IRA.

For that reason, we also reject the appellants' argument that Interior acted arbitrarily in failing to consider a 1978 jury verdict determining that the Tribe did not meet the Montoya definition at particular times.

**V.**

The appellants' final challenge is that the 2021 ROD is arbitrary or capricious in its treatment of the evidence, for a number of reasons. The appellants concede that Interior's M-Opinion provides the controlling standards,[7] but they disagree with the Secretary's application of those standards to the Tribe's historical evidence.

We begin by describing the M-Opinion's interpretation of "under Federal jurisdiction." The M-Opinion first determined that the phrase is ambiguous and that the agency's reasonable interpretation of it should be entitled to deference. M-Opinion at 17. The M-Opinion then rejected the view that "Congress' constitutional plenary authority over tribes is enough to fulfill the 'under federal jurisdiction' requirement." Id. at 17-18.

_____

[7] At the district court, the appellants contested the validity of the M-Opinion, but they have abandoned this argument on appeal. At oral argument, the appellants emphasized that they challenged the M-Opinion and the 2021 ROD to the extent that they "treat BIA school attendance as a 'tag, you're it' form of federal jurisdiction, where the attendance of a single child at such a school becomes the basis" for "under Federal jurisdiction" status that can then be terminated only through express congressional action. We address that argument below.

Instead, after reviewing "the text of the IRA, its remedial purposes, legislative history, and the Department's early practices, as well as the Indian canons of construction, [the M-Opinion] construe[d] the phrase . . . as entailing a two-part inquiry." Id. at 19. The Secretary must first "examine whether there is a sufficient showing in the tribe's history, at or before 1934, that it was under federal jurisdiction." Id. If that is the case, the Secretary then "ascertain[s] whether the tribe's jurisdictional status remained intact in 1934." Id.

With respect to the first part of the inquiry, the focus is on "whether the United States had, in 1934 or at some point . . . prior to 1934, taken an action or series of actions . . . for or on behalf of the tribe or in some instance[s] tribal members . . . establish[ing] or . . . reflect[ing] federal obligations, duties, responsibility for or authority over the tribe." Id. The M-Opinion noted that while in certain cases particular actions "may in and of themselves demonstrate that a tribe was . . . under federal jurisdiction," in other situations "a variety of actions when viewed in concert may demonstrate" that as well. Id.

The M-Opinion listed, as examples of actions demonstrating the exercise of federal jurisdiction, the negotiation or ratification of treaties with the tribe, "the approval of contracts between [the] tribe and non-Indians," "enforcement of the Trade and Intercourse Acts," "education of

Indian students at BIA schools," and "provision of health or social services to [the] tribe." Id. But those examples are not exhaustive and other actions may show that a tribe was under federal jurisdiction. Id.

If the United States' actions towards a tribe, viewed either individually or "in concert," show that the tribe was under federal jurisdiction before 1934, the Secretary proceeds to examine whether that "jurisdictional status remained intact in 1934." Id. Some evidence, such as a tribal vote on "whether to opt out of the IRA in the years following enactment," may be so conclusive that it obviates the need for further inquiry. Id. at 19-20. In other cases, "it will be necessary to explore the universe of actions or evidence that might be relevant" to a determination that the tribe's jurisdictional status was retained. Id. at 19. And "there may be periods where federal jurisdiction exists but is dormant," such that "the absence of any probative evidence that a tribe's jurisdictional status was terminated or lost prior to 1934 would strongly suggest that such status was retained in 1934." Id. at 20. The M-Opinion notes, further, that "evidence of executive officials disavowing legal responsibility in certain instances cannot, in itself, revoke jurisdiction absent express congressional action." Id.

In the 2021 ROD, Interior evaluated four categories of evidence of "federal dealing with the Mashpee Tribe from 1820 to

1934," 2021 ROD at 25: (1) the federal government's consideration in the 1820s of whether to remove the Mashpee Tribe to the western part of the United States and its decision not to do so, id. at 12-16; (2) the attendance of Mashpee children at the federally operated Carlisle Indian School, id. at 16-19; (3) federal surveys and reports discussing the Tribe, id. at 20-23; and (4) the enumeration of the Tribe and its members in federal census records, id. at 23-25. "[V]iew[ing] in concert the totality of the evidence," Interior found that the Tribe was under federal jurisdiction prior to 1934. Id. at 25.

Proceeding to the second step of the M-Opinion's test, Interior examined whether the Tribe's jurisdictional status remained intact as of 1934. See id.; M-Opinion at 19. Interior considered two additional lines of evidence: first, that the federal government "did not seek to implement [the] IRA for the Tribe" in the years following its enactment, 2021 ROD at 26, and second, that some federal officials at the time wrote letters tending to disclaim responsibility over the Tribe, id. at 27-28. Viewing the "greater weight of the probative evidence . . . in its entirety," Interior determined that the federal government had not terminated its jurisdictional relationship with the Tribe. Id. at 29.

The appellants challenge the Secretary's application of the M-Opinion's standards by asserting that, to satisfy the "under

Federal jurisdiction" standard, the Secretary must point to specific actions by the federal government and cannot rely simply on evidence of Congress's and the United States' reserved or unexercised plenary power over Indian affairs. See Haaland v. Brackeen, 599 U.S. 255, 143 (2023) ("In a long line of cases, we have characterized Congress's power to legislate with respect to the Indian tribes as '"plenary and exclusive."'") (quoting United States v. Lara, 541 U.S. 193, 200 (2004)). We agree with this general proposition, and so does the M-Opinion. See M-Opinion at 17-18. If the Secretary's decision were to rest solely on evidence of Congress's potential, but not actually exercised, power over Indian affairs, that would be in error, as it would thwart Congress's intent in imposing the limitation expressed in the "under Federal jurisdiction" requirement. See id. at 9-12 (reviewing the legislative history and concluding that it was inconclusive as to the meaning of the requirement but that it "indicat[ed] a desire to limit the scope of eligibility for IRA benefits"); see also United States v. Flores, 968 F.2d 1366, 1371 (1st Cir. 1992) ("Courts should not lightly read entire clauses out of statutes, but should, to the exact contrary, attempt to give meaning to each word and phrase.") But, for the reasons elaborated below, we do not view the Secretary as having committed any such error in the 2021 ROD.

We reject at the outset, also, the appellants' general argument that the Secretary was not free in the 2021 ROD to depart from the positions taken in the 2018 ROD. That argument is self-evidently wrong. The 2018 decision was vacated by judicial order and the agency was required to reconsider the evidence in accordance with the remand instructions. Bernhardt, 466 F. Supp. 3d at 236. Interior was then allowed to "change its existing position . . . 'as long as [it] provide[d] a reasoned explanation for the change.'" Housatonic River Initiative v. U.S. EPA, 75 F.4th 248, 270 (1st Cir. 2023) (first alteration in original) (quoting Encino Motorcars, LLC v. Navarro, 579 U.S. 211, 221 (2016)). Interior did so. The 2021 ROD specifically addressed why the Secretary evaluated several pieces of evidence differently than in the 2018 ROD. 2021 ROD at 15, 19, 22-23, 25. Generally, in the 2021 ROD, Interior considered all of the evidence "in concert" to determine whether the Tribe was "under Federal jurisdiction." In the 2018 ROD, by contrast, Interior had evaluated only whether each piece of evidence "in and of itself" could unambiguously establish such jurisdiction. See Bernhardt, 466 F. Supp. 3d at 218. Interior's revised approach in the 2021 ROD was in accordance with the M-Opinion and the D.D.C.'s remand order. See M-Opinion at 19; Bernhardt, 466 F. Supp. 3d at 218 ("On remand, the Secretary must follow the directive of the M-

- 23 -

Opinion and consider the probative evidence 'in concert' with each piece of other probative evidence.").

We proceed to the appellants' other challenges as they pertain to the Secretary's consideration of each line of evidence in the 2021 ROD.

**A.        Decision not to remove the Tribe**

First, the Secretary considered evidence related to the federal government's decision, in the 1820s, not to remove the Mashpee Tribe from their lands in Massachusetts to the western parts of the United States.  2021 ROD at 12.  As the 2021 ROD notes, "[d]uring the almost 30-year period between 1815 and 1845, federal Indian policy focused almost entirely on removal of tribes like the Mashpee from the east to relatively less populated areas to the west."  Id.

The Secretary evaluated a report from 1822 (the "Morse Report"), commissioned by the federal government, which, after discussing the conditions of the Mashpee and listing it as a "tribe[] within the jurisdiction of the United States," id. at 13 (emphasis removed), recommended against removing the Tribe "due to their industriousness and tenacious ties to their land," id. at 15.  The full report was "circulated to Congress, as well as within the Executive, and debated in the House of Representatives."  Id. at 14.  "President James Monroe and the executive" also "relied"

on the report "when formulating the . . . removal policy and the decision" not to apply it to the Mashpee Tribe.  Id.

The Secretary determined that "[t]he Morse Report and federal officials' subsequent reliance on it[] provide probative evidence that the Federal Government actively considered the Mashpee within its jurisdiction and subject to the removal policy." Id. at 15.  While the 2018 ROD had assessed this evidence as "show[ing]" only the "potential[]" and not the "actual[]" "exercise of federal Indian authority," the 2021 ROD viewed it as demonstrating that "the United States took specific action" by "consider[ing] and ultimately reject[ing] application of the removal policy to the Mashpee."  Id. (emphasis removed).

The appellants argue that, under the M-Opinion's standards, only "affirmative actions" can show federal jurisdiction, and the government's decision not to remove the Tribe was "in-action[] . . . that left the Mashpees exactly where they had always been."  We agree with the appellants that mere passivity or neglect towards a tribe would not demonstrate the exercise of federal jurisdiction under the M-Opinion's standards, which require evidence of "actions . . . reflect[ing] federal obligations, duties, responsibility for or authority over the tribe."  M-Opinion at 19.  But we view the Secretary's determination that the federal government took "specific action" in this case as not arbitrary or capricious.  The federal

- 25 -

government commissioned a report that examined, among other things, the condition of the Mashpee Tribe and its susceptibility to removal; it issued a specific recommendation not to remove the Tribe; the recommendation was adopted by the Executive Branch and transmitted to Congress; and the Mashpee were exempted from the removal policy. 2021 ROD at 13-15. The decision not to remove the Tribe was the culmination of a process, or a "series of actions," conducted by the federal government and "reflect[ing] . . . responsibility for or authority over the tribe." M-Opinion at 19; see Bernhardt, 466 F. Supp. 3d at 229-30 (finding "the 2018 ROD's treatment of the Morse Report [to be] arbitrary and capricious" partly because "[t]he making of a recommendation is, in and of itself, an action").[8]

---

[8] At oral argument, counsel for the appellants advanced, for the first time, the somewhat different argument that, because the federal government's decision supposedly encompassed all of the Indian tribes in Massachusetts, and not just the Mashpee Tribe, it should be viewed as unexercised plenary power rather than as an action showing federal jurisdiction over the Tribe specifically. Setting aside the factual issue of whether all tribes in Massachusetts were exempted from removal, which appellants have not proven to be the case, the argument is waived, as it was not raised in the briefs. United States v. Leoner-Aguirre, 939 F.3d 310, 319 (1st Cir. 2019). We note, too, that the Morse Report -- as quoted in the 2021 ROD -- recommends against removal of the Mashpee Tribe in particular, and contains a rationale for exempting the Tribe that is specific to it: "They are [of] public utility here as expert whalemen and manufacturers of various light articles; have lost their sympathy with their brethren of the forest; are in possession of many privileges, peculiar to a coast, indented by the sea; their local attachments are strong; they are tenacious of their lands." 2021 ROD at 13-14.

As such, the Morse Report constitutes probative evidence of federal jurisdiction over the Tribe, "[w]hen viewed in concert [with] the totality of the evidence." 2021 ROD at 25. Indeed, the Secretary does not rest the finding that the Tribe was "under Federal jurisdiction" solely on this or on any other single factor in and of itself, but, rather, views all of the evidence "in concert" as establishing that conclusion. Id. That approach accords with the M-Opinion's standards, see M-Opinion at 19, and so we hold that the Secretary's treatment of this evidence was not arbitrary or capricious.

B.        **Attendance at the Carlisle School**

The Secretary also considered evidence related to the attendance of Mashpee children at the Carlisle Indian School, a federally operated institution, "every year between 1905 and 1918." 2021 ROD at 16, 18.

The Carlisle School was established in 1882 through congressional appropriations for the purpose of educating Indian children. Id. at 17. To ensure compliance with the "regulations regarding admission," the school would evaluate each "student's tribe, blood quantum," and whether he or she had been "living in 'Indian fashion.'" Id. at 18. The overarching goal, the Secretary noted, was to advance the federal government's prevailing "'civilization' policy," id. at 16, which involved promoting the assimilation of Indians "into a Western, capitalist way of life,"

as a scholar quoted in the ROD explained, id. (quoting Addie C. Rolnick, Assimilation, Removal, Discipline, and Confinement: Native Girls and Government Intervention, 11 Colum. J. Race & L. 811, 826-27 (2021)). To that end, the Carlisle students were "subject to significant federal control" over their "education, finances, physical health, and freedom of movement." 2021 ROD at 17-18. They were essentially "treat[ed] . . . as wards of the federal government." Id. at 18.

Citing the M-Opinion, the Secretary noted that the federal government's actions toward individual "tribal members" may "in some instances" constitute probative evidence that the tribe was "under Federal jurisdiction." Id. at 19 (citing M-Opinion at 19). In this case, the "extraordinary control" exercised by "federal Indian agents" over Mashpee students' "education, finances and health," as well as the "provision of health and social services" to those students, "constitute[d] a clear assertion of federal authority over the Tribe and its members." Id.; see also M-Opinion at 19 (listing, as examples of probative evidence, the "education of Indian students at BIA schools" and "provision of health or social services to [the] tribe").

The appellants counter with three arguments. First, they claim that Interior "multipli[ed]" the significance of the school-related evidence by considering, as though they were

- 28 -

"separate categories" of evidence, different types of actions undertaken by federal officials at the school -- like control over the students' finances, health care, and education -- that should all "logically collapse into one" category of evidence. But Interior merely examined the multiple "actions," within the meaning of the M-Opinion, that the federal government took in connection with the Carlisle School. We do not see a reason why Interior should be precluded from considering different ways in which certain evidence may be probative.

Second, the appellants argue that the Mashpee children who attended Carlisle School did so voluntarily, which contradicts the Secretary's "rhetoric-filled narrative" that they were forced to attend the school. But, contrary to the appellants' representation, nowhere did the Secretary claim that the Mashpee children were educated at Carlisle without their parents' ostensible consent. See 2021 ROD at 8, 17-19. Setting aside this dispute, the Secretary's reasoning as to why the school-related evidence is probative did not rely on whether the Mashpee children attended the school voluntarily or not. The key factor, uncontested by the appellants, was the degree of control exercised by federal officials over all aspects of those students' lives. Only by way of context did the Secretary explain that such control served a broader policy of assimilation.

The appellants argue that the M-Opinion and the 2021 ROD "irrationally" treat "attendance of a single child" at a BIA school like Carlisle as "the basis for a tribe being under federal jurisdiction in 1934 even when the attendance" ended in 1918, when the Carlisle School closed. But that proposition misrepresents the M-Opinion and the 2021 ROD, under which "BIA school attendance" is a probative piece of evidence supporting the existence of federal jurisdiction but not necessarily the entire basis for such a finding.

Having rejected the appellants' arguments, we find that the Secretary's treatment of the Carlisle School evidence was not arbitrary or capricious.

C.      **Federal reports**

Next, the Secretary evaluated evidence related to three reports commissioned or produced by federal officials that documented, among other things, the Mashpee Tribe's conditions at the time of the reports. Id. at 20-23. Because the reports "provided detailed information regarding the Tribe's status and set forth plans for exercising federal authority over the Tribe," and the government "relied on these reports in making significant decisions regarding the Tribe," they "constitute probative evidence of ['under Federal jurisdiction' status]." Id. at 23.

Appellants argue these reports "resulted in no actions" toward the Tribe. But, again, the Secretary found that the federal

government's collecting information about the Tribe, setting it out in a report that makes recommendations, and subsequently relying on that report to make decisions regarding the Tribe (even the decision not to interfere with it) all constituted "federal actions" under the M-Opinion. Id. at 22-23. The appellants assert those actions should be viewed as "inactions", but they do not explain why, aside from suggesting that they are not "affirmative" or "major" actions. That argument goes to the weight that the Secretary should accord the evidence, and not to whether it constitutes acceptable evidence under the M-Opinion's standards. But the Secretary did not view any individual report or even all of the reports considered together as establishing the existence of federal jurisdiction "in and of [themselves]," but only when they were viewed "in concert" with the totality of the evidence. Id. at 23. We cannot conclude that the reports were given undue weight.

D.      **Federal census records**

Interior considered evidence that the federal government had classified Mashpee tribal members as "Indians" on multiple general censuses and had also included them in specially prepared censuses covering BIA schools such as the Carlisle School. Id. at 23-24. The agency found that those "consistent efforts to enumerate the Tribe and its members in federal reports and census records . . . are probative of and demonstrate the Tribe's

jurisdictional relationship with the Federal Government[,] [w]hen viewed in concert with other probative evidence."  Id. at 25.

The appellants claim that enumeration of tribal members in the general censuses "is no different from the principle of plenary power," and only censuses conducted by the Office of Indian Affairs constitute evidence of a tribe's being "under Federal jurisdiction."  But this rule is not supported by the M-Opinion, and the appellants do not provide any other authority for it.  We uphold, then, the Secretary's determination that inclusion of Mashpee tribal members in federal census rolls is probative of the Tribe's being "under Federal jurisdiction."

**E.      Determination that the Tribe continued to be "under Federal jurisdiction" as of 1934**

After determining that the Tribe had been under federal jurisdiction prior to 1934, when the IRA was enacted, the ROD proceeded to examine whether the relationship remained intact as of that year.  See id. at 25; M-Opinion at 19.  The Secretary evaluated two lines of evidence and found that they did not show the Tribe had lost its jurisdictional status.  2021 ROD at 26-28.

First, the Secretary considered the fact that, following the IRA's enactment, the federal government "did not seek to implement [the statute] for the Tribe."  Id. at 26.  The IRA "directed the Secretary to conduct elections for Indians residing on a reservation to vote to accept or reject application of the

Act," but no such election was organized for the Mashpee Tribe. Id. But, the Secretary noted, "federal officials made several errors in their effort to implement the IRA," and "certain tribes were later recognized as eligible" under the statute even though they had not held an IRA election. Id. As such, "the failure to implement the IRA for the Tribe is not an indication that the Tribe's jurisdictional status was terminated." Id.

Second, the Secretary reviewed a body of correspondence from the 1930s in which BIA officials "generally disclaim[ed] federal jurisdiction over the Tribe." Id. at 27. In particular, Commissioner for Indian Affairs John Collier, denying a Mashpee Tribe member's request for assistance, explained that the Tribe's needs "w[ould] have to be met . . . through local and State channels" until such time as "the Federal Government should undertake further provision for small Eastern groups under the States." Id. The Secretary found that "Collier's letter reflect[ed] the contemporaneous federal policy of deferring to state jurisdiction over New England tribes," as well as "[p]ractical budgetary constraints . . . exacerbated by the Great Depression," and that it "did not rest on a legal analysis as to whether the BIA had legal authority over the Tribe." Id. at 27-28. Other letters disclaiming responsibility over the Mashpee contained erroneous statements. Id. at 28. The Secretary concluded, then, that the letters were "best characterized as

- 33 -

reflections of evolving federal policy, practical constraints on implementing the IRA, and factual mistakes, rather than termination of the Tribe's jurisdictional relationship with the Federal Government." Id. at 27.

As an additional reason not to view the letters' disclaimers as signifying termination of the Tribe's jurisdictional status, the Secretary observed, quoting the M-Opinion, that "evidence of executive officials disavowing legal responsibility in certain instances cannot, in itself, revoke jurisdiction." Id. at 29 (quoting M-Opinion at 20). And "Congress never adopted nor considered any termination legislation regarding the Tribe." Id. So, considering all the "probative evidence . . . in its entirety," the Secretary determined that "the Tribe's jurisdictional status remained intact through 1934." Id.

The appellants argue that BIA officials' failure to apply the IRA to certain tribes that were later found to be eligible does not establish that they committed the same error with respect to the Mashpee Tribe. But the Secretary did not find that the implementation errors proved in and of themselves that the Tribe was under federal jurisdiction, but only that they diminished the weight of the letters' disavowal of responsibility. Id. at 26-28. That determination is not arbitrary or capricious.

The appellants also challenge the 2021 ROD and the M-Opinion to the extent that they set up the principle that only

Congress, acting expressly, can terminate "under Federal jurisdiction" status once it is established. That principle is indeed doubtful. But we do not understand the Secretary's determination as resting on any such broad proposition. Rather, the 2021 ROD concluded that the Tribe's jurisdictional status still existed in 1934 because, as the Secretary determined, the letters disclaiming jurisdiction had been motivated by error or prevailing policy considerations, and not by Interior's considered termination of its jurisdiction over the Tribe. Id. As such, there was little probative evidence showing that jurisdiction had been lost, and "the greater weight of the probative evidence, when viewed in its entirety," showed that it had "remained intact through 1934." Id. at 29. The Secretary did not act arbitrarily or capriciously in making that determination.

## VI.

For the foregoing reasons, we affirm the judgment of the district court.